**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 13 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

DENNIS McCLATCHEY,

Defendant-Appellee.

No. 99-3274

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 98-CR-20030)

---

Tanya J. Treadway, Assistant United States Attorney, (Jackie N. Williams, United States Attorney, Topeka, Kansas, and William H. Bowne, Criminal Division, Fraud Section, Department of Justice, Washington, D. C., with her on the briefs) for Appellant.

Charles W. German, of Rouse, Hendricks, German, May P.C., Kansas City, Missouri, (Scott M. Brinkman with him on the brief) for Appellee.

---

Before **BALDOCK, McWILLIAMS,** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. INTRODUCTION

After a jury convicted Dennis McClatchey of one count of conspiracy and one count of violating the Medicare Antikickback Act (the "Act"), the district court granted McClatchey's motion for acquittal on both charges. The district court concluded there was insufficient evidence from which a reasonable jury could find McClatchey had a specific intent to violate the Act. Additionally, the district court ruled in the alternative that McClatchey would be entitled to a new trial based on prejudicial variances between the indictment and the case presented to the jury. The government appeals both the judgment of acquittal and the alternative grant of a new trial. Exercising jurisdiction[1] pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3731, this court **reverses** both rulings. We also reject McClatchey's two further arguments for affirming the district court's grant of a

[1]McClatchey contends this court lacks jurisdiction to decide this appeal because the government's notice of appeal specified the document being appealed from as the district court's memorandum and order of July 21, 1999, whereas the jurisdictional statement in the government's brief seeks review of the final judgment entered on July 22, 1999. McClatchey argues this insufficient notice violates Federal Rule of Appellate Procedure 3, thus depriving this court of jurisdiction. This court reads the government's jurisdictional statement differently, however, interpreting it as seeking review of the very July 21 order referenced in its notice of appeal. Moreover, McClatchey concedes that he was not misled as to the issues being appealed. In *Bohn v. Park City Group, Inc.*, this court noted that we liberally construe Rule 3 requirements and held that because the appellee "had clear notice of the issue being appealed and [thus would] not be prejudiced" by the alleged Rule 3 deficiency, the court had jurisdiction. 94 F.3d 1457, 1460 (10th Cir. 1996). Pursuant to *Bohn*, therefore, this court has jurisdiction over the government's appeal.

new trial–that the district court improperly instructed the jury it could convict McClatchey if remuneration was paid "at least in part" to induce patient referrals and that the court erred in receiving certain evidence.

## II. BACKGROUND

In 1984, Doctors Robert and Ronald LaHue served as the principals in Blue Valley Medical Group ("BVMG"), a specialized medical practice which provided care to patients in nursing homes and other residential care facilities. That year, the LaHues approached defendant Ronald Keel, an operations Vice President at Baptist Medical Center ("Baptist"), and proposed moving their patients from the hospitals they were currently using to Baptist in exchange for Baptist's purchase of BVMG. Keel brought this proposal to the attention of defendant Dan Anderson, the Chief Executive Officer of Baptist, and then to the rest of Baptist's administrative staff, which included McClatchey, Baptist's Chief Operating Officer. Gerard Probst, Baptist's Chief Financial Officer, testified that he discussed with McClatchey the notion that a relationship with the LaHues would result in the LaHues' "bringing their patients to Baptist" and that McClatchey "support[ed] the idea" of establishing such a relationship.

Although Baptist decided not to purchase BVMG, in January of 1985, Baptist entered into a one-year agreement (the "1985 contract") with the LaHues

to pay each doctor $75,000 per year to act as Co-Directors of Gerontology Services at Baptist. According to Probst's testimony, the negotiation over the 1985 contract occurred in a "backwards" manner, with the parties first establishing a fee and only then agreeing to services which the LaHues would provide. The LaHues then began referring their nursing home patients who required hospital care to Baptist.

In the summer of 1985, at the request of the LaHues, Anderson assigned Baptist employee Tom Eckard the job of serving as a liaison between BVMG and Baptist. Although Eckard's official title was Director of Geriatric Services for Baptist, Eckard worked at BVMG and effectively acted as BVMG's manager. Moreover, Baptist rather than BVMG always paid Eckard's salary. Eckard served in this capacity for approximately eight years, and he testified at trial that his primary responsibility was "to keep the relationship [between Baptist and BVMG] positive." Eckard also testified that during the first year of Baptist's contractual relationship with the LaHues, he observed the LaHues provide "minimal to no[]" services to Baptist.

In June of 1986, Baptist entered into a new one-year agreement (the "1986 contract") with the LaHues, again paying each doctor $75,000 per year to provide various services to Baptist. Although the 1986 contract technically expired after

one year, Baptist continued to pay the LaHues their $75,000 per year fee beyond the summer of 1987.[2]

In March of 1991, Baptist merged with Health Midwest. As a result, Baptist's new legal counsel reviewed its contracts with doctors and doctors' groups, including the 1986 contract with the LaHues. That summer, defendant Mark Thompson, one of the attorneys performing this due diligence review, began discussing with McClatchey and other Baptist executives a way of drafting a new contract with the LaHues to bring the contractual relationship within safe harbor regulations which recently had been promulgated by the Health and Human Services Office of Inspector General. From the summer of 1991 until April of 1993, when a new contract was finally executed (the "1993 contract"), McClatchey oversaw the negotiations between Baptist and the LaHues. Although Keel initially served as Baptist's direct contact person with the LaHues in the negotiation process, McClatchey placed Kevin McGrath in that role in late 1991.

From December 1991 through April 1993, Thompson produced no less than eleven drafts of an agreement. According to McGrath, he and McClatchey would instruct Thompson as to what services he should include in the contract. The first five drafts each included a provision which required the LaHues to perform a

_____

[2]Baptist paid the LaHues $75,000 per year from 1985 through 1993, with the exception that the LaHues only received $68,750 each in 1990.

minimum number of hours of services for Baptist. After the LaHues informed McClatchey, McGrath, and Thompson that they would not accept a minimum hour requirement, that provision was dropped from all further drafts, including the 1993 contract ultimately executed.

Additionally, in late 1991 or early 1992, McClatchey and McGrath learned that the LaHues had not been performing some of the services specified in the 1986 contract and that certain staff members at Baptist were not interested in having the LaHues perform such services. As a consequence, McClatchey, McGrath, and Thompson discussed the concern that the LaHues were not performing sufficient services to justify the fees which Baptist was paying them. On November 5, 1992, an FBI Agent and Medicaid Fraud Investigator visited Baptist and spoke with McClatchey and Anderson about the hospital's relationship with BVMG. As a result, Baptist retained a Baltimore law firm to represent it in the federal investigation and any resulting proceedings. At some point, McClatchey, McGrath, and Anderson talked about terminating Baptist's relationship with BVMG and the LaHues, but they ultimately decided to renegotiate the contract instead.

In October of 1993, McClatchey left his position at Baptist to become the Senior Vice President for Corporate Relations at Health Midwest. On November 26, 1993, Robert LaHue wrote a letter to Anderson terminating the 1993 contract

because LaHue anticipated selling BVMG to another company. In response, Health Midwest executives, including McClatchey, began discussing a strategy to replace the patients which they expected to lose with the termination of the LaHue relationship. When the BVMG sale did not materialize, however, Baptist once again began negotiating a new contract with BVMG and the LaHues. Two temporary agreements sustained the payments to the LaHues through June of 1994.

In 1998, a grand jury returned a superseding indictment against seven individual defendants–Anderson, Keel, McClatchey, the LaHues, Thompson, and attorney Ruth Lehr. The indictment charged McClatchey with one count of conspiracy to offer or pay remuneration to the LaHues in exchange for Medicare and Medicaid patient referrals, in violation of 18 U.S.C. § 2 and 42 U.S.C. § 1320a-7b(b)(2)(A), (B), and one substantive count of offering or paying remuneration to the LaHues to induce such referrals, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), (B).

At the close of the government's case, the district court granted Thompson's and Lehr's (the "attorney defendants") motions for acquittal. The district court further ruled at that time that the government had failed to present sufficient evidence to demonstrate, as the indictment alleged, that any defendant but the LaHues were involved in a conspiracy that extended to six other hospitals

in addition to Baptist. The district court thus limited the jury's consideration of all evidence concerning these six other hospitals to only the charges against the LaHues.

The jury returned a guilty verdict on both charges against McClatchey. After the verdict, however, the district court granted McClatchey's motion for judgment of acquittal on both counts, concluding that no reasonable jury could find McClatchey deliberately intended to violate the Act based on the evidence presented at trial. Pursuant to Federal Rule of Criminal Procedure 29(d), the district court ruled alternatively that should its acquittal decision be overturned, McClatchey would be entitled to a new trial due to prejudicial variances between the case presented at trial and the indictment against him. *See* Fed. R. Crim. P. 29(d) ("If a motion for judgment of acquittal after a verdict of guilty . . . is granted, the court shall also determine whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed . . . .").

## III. DISCUSSION

### A. The District Court's Grant of a Judgment of Acquittal

This court gives no deference to a district court's decision to set aside a jury's guilty verdict and grant a defendant's post-verdict motion for judgment of acquittal. *See United States v. Santistevan*, 39 F.3d 250, 255 (10th Cir. 1994).

We review that motion *de novo*, viewing the evidence in a light most favorable to the government to determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *See id.*

In the instant case, the district court granted McClatchey's post-verdict motion on the basis that the evidence presented failed to support a reasonable finding that McClatchey possessed the requisite criminal intent to be convicted on either count. The parties agree that to convict McClatchey of both the conspiracy charge and the substantive charge of violating the Act, the government needed to prove beyond a reasonable doubt that McClatchey knowingly and willfully joined a conspiracy with the specific intent to violate the Act.[3] A defendant violates the Act when he

> knowingly and willfully offers or pays any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b)(2)(A). In instructing the jury, the district court defined willfulness as follows:

---

[3]Although the conspiracy charge submitted to the jury also allowed it to convict McClatchey if it unanimously found he knowingly and willfully entered into an agreement with the purpose of *defrauding the government*, the only issue which the parties present to this court is whether McClatchey knowingly and willfully entered into an agreement with the purpose of offering or paying remuneration to induce Medicare patient referrals.

An act is done willfully if it is done voluntarily and purposely and with the specific intent to do something the law forbids, that is, with the bad purpose either to disobey or disregard the law. A person acts willfully if he or she acts unjustifiably and wrongly while knowing that his or her actions are unjustifiable and wrong. Thus, in order to act willfully as I have defined that term, a person must specifically intend to do something the law forbids, purposely intending to violate the law.

Neither party quarrels with this instruction. This court will therefore affirm the district court's grant of acquittal only if the evidence presented would not permit any reasonable jury to find beyond a reasonable doubt that McClatchey knowingly, voluntarily, and purposefully entered into an agreement with the specific intent to offer or pay remuneration to induce the LaHues to refer Medicaid patients to Baptist.[4]

Although the district court correctly concluded that no reasonable jury could find beyond a reasonable doubt that McClatchey specifically intended to violate the Act based on the evidence of his involvement, or non-involvement, in the 1985 contract, the 1986 contract, and the loan of Eckard to BVMG, this court disagrees with the district court's assessment of the evidence concerning McClatchey's negotiation of the 1993 contract. The district court concluded that McClatchey repeatedly acted to insure that the 1993 contract was a legal one.

---

[4]McClatchey concedes that if the evidence is sufficient to support the jury's verdict on the conspiracy charge, he would also be criminally liable for the substantive count of violating the Act pursuant to *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946).

Although it may be true that the 1993 contract appears to encompass a legal arrangement, the evidence supports a reasonable inference that McClatchey would never have supportted negotiating and entering into that contract absent his intent to induce the LaHues to continue referring their patients to Baptist.

Specifically, the evidence presented at trial reveals three important aspects of McClatchey's knowledge which inform on his intent. First, well before entering into the 1993 contract, McClatchey knew the LaHues had not performed substantial services required under the prior contracts. The LaHues themselves reported that fact to McClatchey and McGrath in late 1991 or early 1992, and McGrath's subsequent investigation revealed the LaHues were only reporting two hours per week of work at Baptist. Second, McClatchey knew that certain Baptist staff members were not even interested in having the LaHues perform some of these services. McGrath reported to McClatchey that the medical director of the Family Care Residency Program did not want the LaHues teaching residents and that the director of Social Services did not want the LaHues to make nursing home referrals to Baptist patients because her practice had always been to provide families the names of three doctors who could make such referrals. Third, McClatchey understood how important the LaHues' patient referrals were to Baptist's financial health. Eckard even testified that McClatchey placed "substantial emphasis" on Eckard's ability to maximize admissions and profitable

-11-

outpatient visits to Baptist from BVMG business. Based on this knowledge, a reasonable jury could infer that McClatchey's very reason for negotiating a new contract with the LaHues, rather than terminating the relationship, was to induce them to continue their profitable referrals.

McClatchey makes two arguments against the reasonableness of such an inference. He first contends that his surprise at learning of the failure to provide services and his directive to McGrath and legal counsel to investigate and remedy that situation belies an inference of criminal intent. This argument, however, ignores the further evidence that McClatchey knew the hospital staff did not even want or need some of the services specified in the contract; based on that additional evidence, a jury could reasonably infer McClatchey did not really care whether the contractual services were needed or performed, but merely that the LaHues continued to refer their patients to Baptist. Given this evidence, a jury could also infer that McClatchey directed McGrath and legal counsel to address the service issue merely to insure that the final contract appeared on its face to constitute a legal arrangement. This possible explanation is supported by the inclusion in the 1993 contract of a provision requiring the LaHues to provide resident instruction, despite McClatchey's knowledge that the head of the residency program did not desire such services.

-12-

McClatchey also argues that his actions throughout the negotiation process cannot give rise to an inference of his criminal intent because they were entirely directed and controlled by legal counsel. McGrath testified, however, that he and McClatchey told the lawyers what services to include in the contracts, not visa versa. Thus, the jury could reasonably attribute to McClatchey and McGrath both the decision to remove a minimum hour provision from the contract after the LaHues objected to such a requirement and the inculpatory inference of intent that can be drawn therefrom. Moreover, it was not the attorneys but McClatchey, Anderson, and McGrath who made the important decision to negotiate a new contract rather than ending Baptist's relationship with BVMG. Finally, McClatchey did not always heed the attorneys' advice. For example, although Baltimore attorney Craig Holden stressed the importance of reassigning Tom Eckard to a new job within the hospital and even informed BVMG's attorney that this reassignment would occur by February 1, 1993, McClatchey personally delayed that move until March 1, 1993. The evidence, therefore, permitted the jury to reasonably reject McClatchey's good faith reliance on counsel defense and instead find he harbored the specific intent to violate the Act.

The evidence concerning McClatchey's involvement in negotiating the 1993 agreement thus gives rise to a reasonable inference that he knowingly, voluntarily, and purposefully entered into an agreement with the specific intent to

induce the LaHues to refer their Medicaid patients to Baptist. The district court therefore erred in granting McClatchey's post-verdict motion for a judgment of acquittal.

### B. The District Court's Grant of a New Trial

The government also challenges the district court's alternative ruling that McClatchey is entitled to a new trial because the case presented to the jury prejudicially varied from the charges set out in the indictment. McClatchey asserts two further alternative bases for this court to affirm the district court's grant of a new trial: the district court erroneously instructed the jury it could convict McClatchey if remuneration was paid "at least in part" to induce patient referrals; and the district court erred in receiving certain evidence under the co-conspirator non-hearsay rule. This court concludes that the district court's decision to grant McClatchey a new trial was erroneous and rejects his alternative arguments for affirming the ruling.

### 1. Variance

Whether a variance between an indictment and the case presented at trial is sufficiently prejudicial to warrant a new trial is a question of law. *See United States v. Morris*, 700 F.2d 427, 430 (1st Cir. 1983). This court therefore reviews *de novo* the district court's decision to grant a new trial on the basis of a

prejudicial variance. *See Weese v. Schukman*, 98 F.3d 542, 549 (10th Cir. 1996). "Variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *Dunn v. United States*, 442 U.S. 100, 105 (1979). Similarly, a shift in the government's theory from the one set out in the indictment to that presented at trial may also constitute a prejudicial variance. *See United Stats v. Meyers*, 95 F.3d 1475, 1485 (10th Cir. 1996). A new trial is only necessary, however, if the variance substantially prejudiced the defendant's right to a fair trial. *See United States v. Ailsworth*, 138 F.23 843, 849 (10th Cir. 1998).

### *a. The Acquittal of the Attorney Defendants*

McClatchey contends the district court correctly concluded a prejudicial variance arose when the district court granted the attorney defendants' motions for judgment of acquittal. He argues that while the indictment alleged McClatchey and the attorney defendants worked in knowing cooperation to craft "sham" contracts that would make Baptist's relationship with the LaHues appear legal, the acquittal of the attorney defendants allowed the jury to convict McClatchey on one of two entirely different theories–either that McClatchey failed to disclose certain information to the attorney defendants or that he failed to heed their advice. It is this shift in the theory of McClatchey's involvement in the purported conspiracy which he contends constitutes a prejudicial variance.

-15-

Even if the theory on which the jury convicted McClatchey did vary from that set out in the indictment,[5] this court fails to see how McClatchey was substantially prejudiced by such a change. McClatchey argues he was prejudiced by this purported variance because allowing the jury to convict him on one of these two allegedly new theories of his involvement eviscerated his good faith reliance on counsel defense. As Instruction 39 demonstrates, however, by raising a good faith reliance defense, McClatchey himself necessarily required the jury to consider whether he made full disclosure to the attorneys and whether he followed their advice. *See Ailsworth*, 138 F.3d at 850 ("It's presumed that [the jury] followed those instructions." (quotation omitted)). Instruction 39 states,

> If a defendant, before taking any action, sought the advice of an attorney whom he considered competent, in good faith and for the purpose of securing advice on the lawfulness of his possible future conduct, *and made a full and accurate report to his attorney of all*

---

[5]It is highly questionable whether this purported theoretical variance even occurred. As McClatchey concedes, after the attorney defendants were dismissed from the case, the government nonetheless continued to argue that the attorneys culpably cooperated with McClatchey and others to draft the "sham" contracts–the precise theory of McClatchey's involvement alleged in the indictment. Moreover, the jury was never told why the attorney defendants were dismissed from the case, and thus, it may well have convicted him on this same theory.

Although McClatchey now complains that the government should not have been allowed to argue that the attorney defendants acted with less than lawful intentions, he did not object to the government's argument at trial. Furthermore, McClatchey's contention that the government impermissibly presented to the jury the theory set out in the indictment is strangely at odds with his complaint on appeal that the theory presented to the jury differed from the one alleged in the indictment.

> *material facts which he knew and acted strictly in accordance with the material advice of his attorneys who had been given a full report*, then the defendant would not be knowingly and willfully doing wrong in doing something the law forbids . . . .

(emphasis added). This court fails to understand how shifting the jury's attention to two allegedly new theories of McClatchey's involvement, which were already part and parcel to his own defense theory, in any way eviscerated that defense. McClatchey presumably understood when he decided to raise a good faith reliance defense that full disclosure and following the attorneys' advice are elements of that defense; thus, the purported variance in prosecution theories should not have surprised or prejudiced McClatchey.

Moreover, the district court granted the attorney defendants' motions for judgment of acquittal at the close of the government's case, before McClatchey presented his defense and well before he took the stand. McClatchey therefore had ample time to alter his evidentiary and testimonial strategy to diminish any prejudice which might have resulted from the district court's decision. *Cf. Lincoln v. Sunn*, 807 F.2d 805, 813 (9th Cir. 1987). Additionally, McClatchey's failure to either move for a new trial or request a continuance when the district court granted the attorney defendants' motions "militates against any argument that he was surprised by or not prepared to defend against the [allegedly new prosecution] theory." *United States v. Weiss*, 752 F.2d 777, 790 (2d Cir. 1985).

-17-

Relatedly, McClatchey argues the alleged variance was substantially prejudicial because by indicting the attorney defendants, despite the lack of evidence against them, the government tainted the attorney defendants' actions in the minds of the jury, a taint which harmed McClatchey's good faith reliance defense. This argument is also without merit, however, because McClatchey's good faith reliance defense in no way depended on the legality of the attorney defendants' actions. As Instruction 39 indicates, even if the attorney defendants were acting with criminal intent, so long as McClatchey sought their advice *in good faith*, made full disclosure to them, and acted strictly in accordance with their instructions, he would have been entitled to an acquittal.

Finally, McClatchey argues the district court's acquittal of the attorney defendants prejudiced him because the jury likely interpreted this ruling along with the continued prosecution of McClatchey as a signal that the court believed McClatchey was guilty. The jury, however, was not informed that the district court had acquitted the attorney defendants. Instead, the district court merely told the jurors that "the charges against [the attorney defendants] . . . have been removed from your consideration and are no longer before you for decision." The district court further instructed the jury, "Do not concern yourself with these developments and do not speculate about them." As noted earlier, this court presumes that the jury followed the district court's instructions and therefore did

not speculate as to the reason why the charges against the attorney defendants had been removed from its consideration. *See Ailsworth*, 138 F.3d at 850. The acquittal of the attorney defendants, therefore, did not substantially prejudice McClatchey.

In sum, even if the district court's acquittal of the attorney defendants created a variance between the allegations in the indictment and the case presented at trial, this court is unconvinced that such a variance substantially prejudiced McClatchey. The district court thus improperly granted McClatchey's motion for a new trial on this basis.

### b. The Other Hospitals Evidence

The indictment alleged that all seven indicted conspirators engaged in one broad conspiracy to allow the LaHues to enter into illegal arrangements with Baptist and six other hospitals. At the close of the government's case, however, the district court ruled that the evidence failed to prove McClatchey, Anderson, or Keel were at all part of a conspiracy involving the six other hospitals. The district court thus limited all evidence relating to these six other hospitals to the charges against the LaHues. In granting McClatchey's motion for a new trial, the district court concluded that its narrowing of the conspiracy charge against McClatchey constituted a variance and that the "spillover from the other hospitals

-19-

evidence" prejudiced him. The district court stated, however, that "[w]ere this factor standing alone, the court would not grant Mr. McClatchey a new trial."

Again, this court concludes that any variance caused by the narrowing of the conspiracy charge did not substantially prejudice McClatchey. In *United States v. Powell*, this court stated,

> A defendant's substantial rights are affected if the jury determines a defendant's guilt by relying on evidence adduced against coconspirators who were involved in separate conspiracies. Relevant factors include: 1) whether the proliferation of separate conspiracies in the case affected the jury's ability to segregate each defendant's individual actions and participation; 2) whether the variance caused confusion among the jurors as to the limited use of certain evidence; and 3) the strength of the evidence underlying the conviction.

982 F.2d 1422, 1431-32 (10th Cir. 1992) (citation omitted). First, the jury's acquittal of Ronald LaHue on the charge of soliciting and receiving bribes from two of the other hospitals and its acquittal of Keel on all charges based on the statute of limitations strongly indicates that it was perfectly capable of segregating and separately evaluating each defendant's individual actions and participation. Second, the district court repeatedly instructed the jury both during and at the end of the trial not to consider the other hospitals evidence against anyone but the LaHues, thus insuring the jury's understanding of the limited use of that evidence. Third, though this court concedes that the case against McClatchey was relatively close, as discussed above the government did present sufficient evidence apart from the other hospitals evidence to prove McClatchey's

guilt beyond a reasonable doubt. *See supra* Section III.A. Finally, this court has held that "there is no fatal variance where a defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment." *Ailsworth*, 138 F.3d at 849 (quotation omitted). The narrowing of the conspiracy charge against McClatchey, therefore, did not constitute a fatal variance warranting a new trial.

## 2. The Jury Instruction

In Instruction 32, the district court charged the jury as follows:

> In order to sustain its burden of proof against the hospital executives for the crime of violating the Anti-Kickback statute, the government must prove beyond a reasonable doubt that the defendant under consideration offered or paid remuneration with the specific criminal intent "to induce" referrals. To offer or pay remuneration to induce referrals means to offer or pay remuneration with the intent to gain influence over the reason or judgment of a person making referral decisions. The intent to gain such influence must, *at least in part*, have been the reason the remuneration was offered or paid.
> On the other hand, defendants Anderson, Keel, and McClatchey *cannot be convicted merely because they hoped or expected or believed that referrals may ensue from remuneration that was designed wholly for other purposes*. Likewise, mere oral encouragement to refer patients or the mere creation of an attractive place to which patients can be referred does not violate the law. There must be an offer or payment of remuneration to induce, as I have just defined it.

(emphasis added). McClatchey contends this instruction was incorrect and warrants a new trial, because a defendant should not be convicted under the Act

-21-

when his offer or payment of remuneration was motivated merely *in part* to induce referrals, but rather the motivation to induce referrals must be the defendant's *primary purpose*.[6] "We review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1262 (10th Cir. 1999).

Whether the "at least in part" or "one purpose" standard applied in the instant case constitutes a correct interpretation of the Act is an issue of first impression in this Circuit. McClatchey urges this court to reject the test set out in Instruction 32 as too broad, because "[e]very business relationship between a hospital and a physician is based 'at least in part' on the hospital's expectation that the physician will choose to refer patients." This argument, however, ignores the actual instruction given in the instant case, in which the district court specifically informed the jury that "McClatchey cannot be convicted merely because [he] hoped or expected or believed that referrals may ensue from remuneration that was designed wholly for other purposes." According to this

---

[6]In his brief, McClatchey moves this court to allow him to provide additional briefing on this issue and the next should we reach them. This court is convinced that McClatchey had a fair opportunity to fully brief these arguments and thus denies that motion. *See* Fed. R. App. P. 28(c) ("Unless the court permits, no further briefs [beyond the reply brief] may be filed.").

instruction, therefore, a hospital or individual may lawfully enter into a business relationship with a doctor and even hope for or expect referrals from that doctor, so long as the hospital is motivated to enter into the relationship for legal reasons entirely distinct from its collateral hope for referrals.[7]

The only three Circuits to have decided this issue have all adopted the "one purpose" test.[8] *See United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68, 71-72 (3d Cir. 1985). In *Greber*, a doctor who owned a diagnostic laboratory was convicted of violating the Act because he paid "interpretation

---

[7]This court recognizes that it may be difficult for a jury to distinguish between a motivating factor and a collateral hope or expectation. Making such difficult factual determinations, however, is the very role which our system of justice assigns to the finder of fact. *Cf. United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716-17 (1983) ("The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else." (quotation omitted)).

[8]McClatchey incorrectly contends that the First and Eighth Circuits have "tacitly approved" the "primary purpose" test. In *United States v. Bay State Ambulance & Hosp. Rental Service, Inc.*, the First Circuit explicitly declined to decide whether the "primary purpose" or "one purpose" test is appropriate, because the defendants had been convicted under the more stringent "primary purpose" standard. *See* 874 F.2d 20, 30 (1st Cir. 1989). In resolving a separate issue, however, the *Bay State Ambulance* court did rely upon the reasoning employed by the Third Circuit in adopting the "one purpose" test in *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985). *See Bay State Ambulance*, 874 F.2d at 30. The *Bay State Ambulance* court even stated it was "impressed with the . . . reasoning" of *Greber*. *Id.* In *United States v. Jain*, whether the Act encompasses the "primary purpose" or "one purpose" standard was simply not an issue on appeal to the Eighth Circuit. *See* 93 F.3d 436 (8th Cir. 1996).

fees" to other physicians to induce them to refer Medicare patients to use his laboratory's services. *See id.* at 69-70. Defendant Greber asserted that these interpretation fees compensated the physicians both for providing initial consultation services and for explaining the test results to the patients. *See id.* at 70. On appeal, Greber argued that a jury instruction much like Instruction 32 was erroneous, because the Act requires the government to prove that the *only purpose* for the interpretation fees was to induce referrals and that compensation for services actually rendered could not constitute a violation of the Act. *See id.* at 71. Carefully examining the language and purpose of the Act, the Third Circuit rejected Greber's proposed interpretation and instead held that "if *one purpose* of the payment was to induce referrals, the [Act] has been violated." *Id.* at 69 (emphasis added); *see generally id.* at 70-72. Specifically, the *Greber* court noted that when Congress amended the Act in 1977 to deter "the growing problem of fraud and abuse in the system," it added a proscription against the payment of "remuneration," which contemplates the rendering of a service, whereas the predecessor statute merely prohibited payment of "kickbacks," for which no service is rendered. *Id.* at 70-71, 71-72. The *Greber* court thus concluded that the "one purpose" test is consistent with the legislative intent behind the amended Act. *See id.* at 72.

This court agrees with the sound reasoning in *Greber* and thus holds that a person who offers or pays remuneration to another person violates the Act so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals. Because the district court accurately informed the jury of the applicable law, McClatchey is not entitled to a new trial based on the jury instructions.

### 3. Co-Conspirator Non-Hearsay Evidence

McClatchey also argues he is entitled to a new trial because the district court erroneously admitted evidence under the co-conspirator non-hearsay rule.[9] *See* Fed. R. Evid. 801(d)(2)(E). McClatchey, however, fails to identify the specific statements which he now contends were wrongly admitted or even meet this court's modest requirement that he provide citations to the record where these statements might be found. *See* Tenth Cir. R. 28.2(C)(2), (3)(a). Due to these failures, this court cannot even attempt to assess the merits of his argument. The issue of the admissibility of this evidence is therefore waived on appeal. *See Shaw v. AAA Engineering & Drafting, Inc.*, Nos. 97-6265, -6266, 2000 WL 640249, at *16 n.25 (10th Cir. May 18, 2000) (concluding challenge to evidence was waived on appeal because the appellant did not specify the precise evidence which it claimed was wrongly admitted).

---

[9]For the same reason stated in note 6, *supra*, this court denies McClatchey's motion to provide further briefing on this issue.

## IV. CONCLUSION

This court concludes that the government presented sufficient evidence from which a reasonable jury could infer McClatchey knowingly, voluntarily, and purposefully entered into an agreement with the specific intent to violate the Act. This court also disagrees with the district court's ruling that prejudicial variances between the indictment and the case presented at trial warrant a new trial. Nor do the jury instructions provide the basis for granting McClatchey a new trial. We therefore **REVERSE** the judgment of acquittal and the alternative order for a new trial entered by the District Court for the District of Kansas and **REMAND** to that court with instructions to reinstate the verdict rendered by the jury.