**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**December 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No.05-4314
(D.C. No. 2:04-CR-00808-TC)
(D. Utah)

LARRY LETTIG,

Defendant-Appellant.

**ORDER AND JUDGMENT**[*]

Before **HENRY, HOLLOWAY** and **McCONNELL**, Circuit Judges.

A jury convicted Defendant-Appellant Larry Lettig ("Lettig") of armed bank

robbery and using a firearm during a crime of violence, violations of 18 U.S.C. § 2113(a)

and (d), respectively. Lettig then filed this direct appeal challenging the sufficiency of the

evidence as a matter of law and fact, the content of one jury instruction, and the

prosecutor's alleged vouching. We exercise jurisdiction pursuant to 28 U.S.C. § 1291

---

[*]After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination
of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). This case is
therefore submitted without oral argument. This order and judgment is not
binding precedent except under the doctrines of law of the case, res judicata and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 (eff. Dec. 1, 2006) and 10th Cir. R. 32.1 (eff. Jan. 1,
2007).

and **affirm** Lettig's convictions.

## I. FACTS

On April 25, 2003, the Pacific Rails Credit Union was robbed. R., Vol. II, at 42. The United States subsequently indicted and tried Lettig for this armed bank robbery and for using a firearm during a crime of violence. R., Vol. I, at 1-2. Both the government and Lettig elicited testimony from bystanders, Lettig's alleged accomplices, and two of the alleged accomplices' prison mates. Since Lettig argues, *inter alia*, that the witnesses' testimony is inconsistent and insufficient to support his convictions, we summarize the testimony presented *seriatim*.

Ms. Sherrie Larsen, a bank customer present when the robbery took place, testified that three men "burst" into the bank while she was cashing a check. R., Vol. II, at 43. One of the robbers said that the men were holding up the bank and told everyone to "hit the floor." Id. She recalled that at least one robber possessed a firearm, which she described as a silver pistol. Id. at 44. After about two or two and a half minutes, one of the robbers said "let's go Mary," or something similar, and the three robbers exited the bank and entered a blue car. Id. at 47, 64. Ms. Larsen testified that there were four people in the blue car when the car drove away from the bank. Id.

On cross-examination, Ms. Larsen admitted that she initially believed that two robbers entered the bank together and that there was a time gap before the third person entered. Id. at 59. But Ms. Larsen never recanted her testimony that four individuals participated in this robbery. Nevertheless, Lettig contends that Ms. Larsen initially

believed that only three robbers were present, but later changed her testimony at trial after reviewing the bank's security tape of the robbery.

Ms. Janice Camomile, a Pacific Rails bank teller, testified that two robbers entered her office, removed the phone from her ear, and ordered her to open the safe. Id. at 70, 72. She testified that both robbers brandished guns and that one of the guns was silver in color. Id. at 72. After she told the robbers that she did not know the safe's code, the robbers unsuccessfully attempted to open the safe, breaking the safe's keypad in the process. Id. at 75. Ms. Camomile informed the robbers that they broke the safe and it could no longer be opened. Id. The robbers then fled her office. Id. at 76.

Ms. Terri Smith, the teller who was assisting Ms. Larsen when the bank was robbed, testified that she saw two robbers enter the bank, one of whom had blue eyes and was wearing glasses under his mask. Id. at 83-84. She testified that the other robber possessed a silver-colored handgun. Id. at 90. Ms. Smith testified that she heard one robber say "let's go Mary" after the robbers retrieved money from her teller box and left Ms. Camomile's office. Id. at 89, 90, 91. The robbers then exited the bank and entered a get-away car. Id. at 92.

Mr. Douglas Bradley, a Pacific Rails loan manager, testified that one of the robbers entered his office, brandished a silver-colored pistol, ordered him to lie face down on the floor, and removed his phone from the wall. Id. at 93, 94-95. Although Mr. Bradley only saw one robber, he recalled hearing someone say something to the effect of "come on Mary" immediately before the robbers left the bank. Id. at 96.

Mr. George Crowder, the bank's President and manager, testified that he became aware of the robbery after observing the robbers on a video monitor in his office. Id. at 97, 98. Shortly thereafter, one robber entered his office, pointed a silver-colored gun in his direction, and ordered him to lie on the floor. Id. at 100. Mr. Crowder observed two robbers on his video monitor during the robbery, but he later reviewed the security tape and was able to identify three masked individuals. Id. at 101. Mr. Crowder confirmed that the bank was federally insured when the robbery took place. Id. at 97.

Ms. Cynthia Roberts, a customer who left the bank shortly before the robbery took place, testified that she observed a blue car moving around the street corner toward the bank. Id. at 108-09. She testified that she observed the car, and the *three* men in it, through her car's side mirror. Id. at 109. Ms. Roberts saw the car for about twenty seconds, during which she saw one man with a "Jackson Brown" haircut who was nestled against the back door; the two other men might have had buzz cuts. Id. at 111.

Mr. Channon Singh testified that he transported Thomas Gurule, Larry Lettig, and Allen Esplin to and from the bank. R., Vol. III, at 175. He stated that Lettig and Esplin cased the credit union about three weeks before the robbery, but that they all planned the robbery the day before it was executed. Id. at 176, 200. On the day of the robbery, Singh drove a "bluish gray" car to the Union Pacific employee parking lot; Esplin arrived separately with the others in his own car. Id. at 177. When they arrived at the parking lot, everyone entered the car Singh was driving and headed toward the bank. Id. at 177-78, 179. Lettig and Esplin were in the back of the car and Gurule was in the front of the

car, though Singh did not know the order in which Lettig and Esplin were seated. Id. at 180, 210.

Singh testified that they arrived at the credit union soon after leaving the Union Pacific parking lot. Id. at 181. Lettig and Esplin entered the Pacific Rails Credit Union first. Id. Singh needed to tell Gurule which door to enter, so Gurule entered the bank shortly after. Id. They executed the robbery in four or five minutes, during which Lettig displayed a silver-colored gun, and then the robbers got back into the blue car and reclined on the floor as Singh drove away. Id. at 181, 185. Singh testified that they went back to the Union Pacific parking lot, switched into Esplin's car, drove to Singh's apartment, and divided the stolen money (about $600 each, he testified). Id. at 186-187.

Singh informed the jury that he would receive about a four-year prison sentence, compared to a possible thirty-two-year sentence, in exchange for testifying against Lettig. Id. at 189. During this portion of Singh's testimony, the prosecutor referred to the truthfulness provision in Singh's plea agreement and also referred to himself using the first person pronoun. Id. at 189-90. Lettig did not object to the prosecutor's alleged vouching, but he did highlight that Singh denied being involved in the robbery when the police first confronted him. Id. at 208.

Mr. Allen Esplin, one of Lettig's alleged accomplices, testified that he joined with Singh, Gurule, and Lettig to rob the Pacific Rails Credit Union (he was the accomplice with the "Jackson Brown" haircut). Id. at 218, 219, 246. Esplin testified that he was in the area near the bank when he decided that it might be a good place to rob. Id. at 220.

Subsequently, he mentioned the opportunity to Lettig and Singh, who later cased the bank, and they all planned the robbery about one month in advance (he could not remember the exact time line). Id. at 220, 221. The group agreed that Lettig would use a silver-colored gun to control the "general area" of the credit union. Id.

Concerning the day of the robbery, Esplin echoed Singh's testimony about going to the Union Pacific employee parking lot and switching into the blue car. Id. at 223. Esplin testified that he did not remember how they were seated in the blue car, except to say that he was in the backseat and that Singh was driving; but in the defendant's confusing cross-examination, Esplin recalled telling the grand jury that he was in the back seat with Gurule and that Lettig was in the front with Singh, contrary to Singh's testimony. Id. at 225, 265-268. They arrived at the bank soon after, and Esplin, Lettig (pistol in hand), and Gurule entered the bank. Id. at 229.

After identifying these robbers on the bank's security tape, Esplin testified that he stole money from a teller's drawer, and then he, Lettig, and Gurule went into an office and unsuccessfully attempted to open the safe (Esplin told the grand jury that only he and Gurule entered this office). Id. at 234-35, 269-70. The robbers fled the bank soon after and entered the blue get-away car. Id. at 235-36. Esplin testified that he and Gurule were in the back seat of the car when they drove away from the bank. Id. at 236. After arriving back at the Union Pacific parking lot, the robbers switched into Esplin's car and returned to Singh's apartment—at which time they split up the money (about $450-500 each, he testified). Id. at 237, 239.

- 6 -

Esplin admitted committing four bank robberies and offering his testimony against Lettig in exchange for a reduced sentence (from a possible life sentence to a sentence in the range of 151-188 months). Id. at 240, 241, 246. The prosecutor also referred to the truthfulness provision in Esplin's plea agreement during his questioning. Id. at 245.

Lettig sought to impeach Singh and Esplin's testimony by eliciting testimony from Todd Murdock and Chris Mullins, both of whom were imprisoned in the same prison as Esplin and Lettig. Both Murdock and Mullins testified that Esplin tearfully told them that he lied about Lettig's involvement in the robbery. Id. at 302, 307-08, 320-21 Esplin denied having done so in response to Lettig's questions, id. at 332-334, and the government challenged the possibility that a hardened criminal would tearfully confess such a set-up to another inmate—especially given that prisoners are notorious for treating snitches harshly, which Esplin knew from his time in prison.

As noted earlier, the jury found Lettig guilty, and he appeals his convictions.

## II. DISCUSSION

On appeal, Lettig assigns error in four respects: (1) his accomplices' uncorroborated testimony was insufficient to sustain his convictions as a matter of law; (2) his accomplices' uncorroborated testimony was insufficient to sustain his convictions as a matter of fact; (3) the jury instruction about accomplice testimony inadequately or inaccurately conveyed the applicable law; and (4) the prosecutor impermissibly vouched for the government witnesses' testimony. The government rejects each of Lettig's arguments.

## A. Accomplice Testimony

This Court reviews *de novo* whether the government presented sufficient evidence to support a jury's verdict. United States v. Lewis, 240 F.3d 866, 870 (10th Cir. 2001). We will "ask only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Hanzlicek, 187 F.3d 1228, 1239 (10th Cir. 1999) (quotation omitted).

### 1. Sufficiency as a Matter of Law

Lettig asks us to adopt as a per se rule that an accomplice's uncorroborated testimony is insufficient to sustain a conviction. While Lettig recognizes that his legal argument for this rule rests upon pre-Crawford v. Washington, 541 U.S. 36 (2004), cases concerning hearsay testimony and the Confrontation Clause, he asserts that the policies underlying these cases are equally applicable here. Yet as recently as last year, this court stated that "[a] conviction may stand merely on the uncorroborated testimony of an accomplice." United States v. Magallanez, 408 F.3d 672, 682 (10th Cir. 2005) (citing United States v. McGuire, 27 F.3d 457, 462 (10th Cir. 1994)).

Although our precedents are unequivocal on this point of law, Lettig asks us to overrule our precedents as inconsistent with Supreme Court case law. The crux of Lettig's argument turns on a distinction between "reliability" and "credibility" insofar as accomplice testimony is inherently unreliable as a matter of law regardless of the witness'

credibility. Indeed, Lettig argues, the Supreme Court has explicitly recognized the inherent unreliability of accomplice testimony. See, e.g., Lilly v. Virginia, 527 U.S. 116, 132 (1999).

Most importantly, Lettig's argument is contradicted by Caminetti v. United States, 242 U.S. 470, 495 (1917), where the Supreme Court stated that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them." Even one of Lettig's secondary sources, a law review article authored by a Circuit Judge, recognized that "[t]he United States Supreme Court has held that an appellate court can sustain a conviction based solely on the uncorroborated testimony of an accomplice." J. Arthur L. Alarcon, Suspect Evidence: Admissibility of Co-Conspirator Statements and Uncorroborated Accomplice Testimony, 25 Loy. L.A. L. Rev. 953, 953 (1992) (also stating that "[a]s a federal court of appeals judge, regardless of my qualms about the quality of [accomplice testimony], I must follow the Federal Rules of Evidence, the United States Supreme Court's rulings and the law of my circuit, all of which hold that co-conspirator statements and uncorroborated accomplice testimony can sustain a conviction").

Moreover, Lettig has failed to cite a case bridging the legal and logical gap between requiring juries to show caution toward an accomplice's uncorroborated testimony and requiring courts to overturn convictions based solely upon such testimony. Notwithstanding Lettig's erroneous assertions to the contrary, the Supreme Court cases he cites evaluated the unreliability of accomplice testimony for the purpose of determining

whether the testimony fell within a firmly rooted hearsay exception and, relatedly, whether the Confrontation Clause required cross-examination. The cases do not call into question the longstanding rule that an accomplice's uncorroborated testimony is sufficient to sustain a conviction. Compare Caminetti, 242 U.S. at 495, and Magallanez, 408 F.3d at 682, with Lilly, 527 U.S. at 131-32, and Bruton v. United States, 391 U.S. 123 (1968).

Given the lack of authority for the proposition that an accomplice's uncorroborated testimony may not support a conviction, Lettig's argument to overrule our longstanding precedent is reducible to an array of policy concerns. Yet again, the policy sources Lettig cites urge juries to cautiously consider accomplice testimony, but do not take the extra step of urging exclusion entirely. In light of unchallenged Supreme Court and Tenth Circuit case law, we decline Lettig's invitation to adopt the per se rule he advances.

Accordingly, we hold here that the accomplices' uncorroborated testimony is legally sufficient to sustain Lettig's convictions.

## 2. Sufficiency as a Matter of Fact

Lettig next asserts that the accomplices' testimony was unreliable as a matter of fact. While we accept Lettig's point that "reliability" and "credibility" are distinct concepts, rendering it possible for us to review whether uncorroborated testimony is unreliable as a matter of law, Lettig's argument here amounts to a credibility challenge. Specifically, the essence of Lettig's argument is that the accomplices' testimony is unreliable as a matter of fact because it is plagued with inconsistencies and was given in exchange for a lenient plea bargain. Both of these claims directly bear on whether the

witnesses were believable. Lettig's assertion to the contrary essentially urges us (again) to adopt the per se rule that an accomplice's uncorroborated testimony is not sufficient to sustain a conviction. Repackaging the same argument in a factual context does not avoid the well-established rule that a jury may convict a defendant solely on the basis of an accomplice's uncorroborated testimony.

Lettig's arguments implicate two lines of case law. First, we review *de novo* whether the prosecution presented sufficient evidence to support a conviction. In resolving this issue we will not re-weigh the evidence or assess the witnesses' credibility. United States v. Serrata, 425 F.3d 886, 895 (10th Cir. 2005). Thus, to the extent that Lettig challenges the weight of the accomplices' testimony, which he does by speculating that the plea bargain created incentives to lie and by trying to highlight inconsistencies in the testimony presented and the unreliability of accomplice testimony, his "challenge to the weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal." United States v. Torres, 53 F.3d 1129, 1140 (10th Cir. 1995) (citation omitted).

Second, while a jury may convict based on an accomplice's uncorroborated testimony, the testimony must not be incredible on its face or otherwise incapable of establishing guilt beyond a reasonable doubt. Id. We reject Lettig's argument that the testimony is incredible on its face or otherwise incapable of establishing guilt beyond a reasonable doubt. The accomplices uniformly testified that Lettig entered the bank with a gun, robbed the bank, and left with the accomplices in a blue vehicle. Moreover, the

eyewitnesses' testimony largely corroborated the accomplices' versions of the event.  In judging this testimony, a reasonable jury could have put the alleged inconsistencies aside, or could have accepted the testimony's shortcomings, and still believed beyond a reasonable doubt that Lettig was the armed robber depicted on the bank's security video.  Furthermore, the district court explicitly instructed the jury that the accomplices' testimony should be examined with great care given the risk that accomplices will create a falsehood to secure their own liberty.

Thus, the accomplices' testimony, considered in the light of the district court's cautionary instruction, supports affirmance of Lettig's convictions.  Accordingly, we hold that the accomplices' testimony was factually sufficient to sustain Lettig's convictions.

### B.  Jury Instruction

"We review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole *de novo* to determine whether they accurately informed the jury of the governing law." United States v. McClatchey, 217 F.3d 823, 834 (10th Cir. 2000) (quotation omitted).  Furthermore, "[n]o particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law." Webb v. ABF Freight Sys., Inc., 155 F.3d 1230, 1248 (10th Cir. 1998) (quotation omitted).

The district court must read a cautionary instruction to the jury when an accomplice's uncorroborated testimony is the only evidence directly tying the defendant to the crime. United States v. Gardner, 244 F.3d 784, 789 (10th Cir. 2001).  Specifically,

the instruction must inform the jury that an accomplice's testimony "must be carefully scrutinized, weighed with great care, and received with caution," though this exact language is not required. United States v. Hill, 627 F.2d 1052, 1053, 1054 (10th Cir. 1980). Our ultimate concern is whether the court's rulings and instructions recognized the defendant's rights. Id. at 1054.[1]

---

[1]Lettig submitted to the district court two proposed instructions concerning the accomplices' testimony. The district court ultimately adopted the following instruction:

> You have heard witnesses who testified that they were actually involved in planning and carrying out the crimes charged in the indictment
> The law allows the use of accomplice testimony.
> However, it is also the case that accomplice testimony is of such nature that it must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe.
> I have given you some general considerations on credibility and I will not repeat them all here. Nor will I repeat all of the arguments made on both sides. However, let me say a few things that you may want to consider during your deliberations on the subject of accomplices.
> In this case, you must consider the benefits the accomplices will receive through their agreements with the government.
> In sum, you should look at all of the evidence in deciding what credence and what weight, if any, you would want to give to the accomplice witnesses.
> You should bear in mind that a witness who has entered into such a plea agreement with the government has an interest in this case different than any ordinary witness. A witness who realizes that he may be able to obtain his own freedom, or receive a lighter sentence by giving testimony favorable to the prosecution, has a motive to testify falsely. Therefore, you must examine his testimony with caution and weigh it with
>                                        (continued . . . )

Lettig asserts that the jury instruction should have mentioned several factors: (1) the government's exclusive ability to exchange a lenient sentence for a witness' testimony; (2) the accomplices' special ability to convincingly falsify testimony about the criminal act; (3) the accomplices' motive to minimize their role in the offense; (4) that the jury should convict the defendant based upon the accomplices' testimony only if the jury believes the testimony beyond a reasonable doubt; and (5) that accomplice testimony is inherently unreliable as a matter of law.

Lettig has not cited any authority showing that the district court's instructions were inadequate. As fully set forth above, the district court instructed the jury that "accomplice testimony is of such nature that it must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe." The instruction also stated that "you must consider the benefits the accomplices will receive through their agreements with the government." The court, earlier in the charge, informed the jury in an elaborate instruction on reasonable doubt that it may only convict Lettig if the government proved him guilty beyond all reasonable doubt. If the proof was not of this convincing character, the court explained, the jury was to find Lettig not guilty. As to the weight of the accomplices' testimony, the court instructed the jury that it

<hr>

[1](. . . continued)
great care. If, after scrutinizing his testimony, you decide to accept it, you may give it whatever weight, if any, you find it deserves.
Aplt. Br. at 60, Addendum C.

-14-

should bear in mind that a witness who has entered into such a plea agreement with the government has an interest in this case different than any ordinary witness. A witness who realizes that he may be able to obtain his own freedom, or receive a lighter sentence by giving testimony favorable to the prosecution, has a motive to testify falsely. Therefore, you must examine his testimony with caution and weigh it with great care. If, after scrutinizing his testimony, you decide to accept it, you may give it whatever weight, if any, you find it deserves.

Aplt. Br. at 60, Addendum C.

This charge repeatedly warned the jury that it must scrutinize the accomplices' testimony with great care. It identified the risk that accomplices will testify falsely and that the accomplices were receiving benefits from the government in exchange for their testimony. The court further instructed the jury that it was not required to give any weight to the accomplices' testimony. Thus, the instructions conveyed the applicable law that accomplice testimony must be "carefully scrutinized, weighed with great care, and received with caution" and adequately addressed Lettig's concerns about the accomplices' plea bargains and motive to testify falsely.

Lettig relies on Todd v. United States, 345 F.2d 299, 300 (10th Cir. 1965), where we stated that "[t]he sufficiency of the instructions depends upon other incriminating circumstances of the case tending to corroborate the informer," to claim that the court should have instructed the jury about *all* of the pitfalls and issues with accomplice testimony. However, even with his citation to Todd, Lettig fails to provide any authority demonstrating the particular ways in which the instructions failed to convey the applicable law. Indeed, Todd held that while special cautionary instructions are required

if an informer's incriminating testimony is uncorroborated or unsubstantiated—a prescription the district court complied with here—the fact that the informer's testimony *was* corroborated justified the district court's decision not to provide such a cautionary instruction. Id. at 301. Thus, Todd affirmed a trial court's decision to reject a cautionary instruction in the circumstances of the case; its language concerning uncorroborated testimony merely restated what we have repeatedly held to be the law: a cautionary instruction must be given when an accomplice presented uncorroborated testimony, but no particular form of words is required when giving the instruction. Id. at 300. The district court's instruction here accurately conveyed the applicable law concerning accomplice testimony.

### C. Prosecutorial Vouching

Lettig concedes that he failed to lodge objections with respect to the prosecutor's alleged vouching and that he has only raised this issue in his reply brief on appeal. Accordingly, Lettig has filed a motion for leave to expand the issues on this appeal. However, even if we granted this motion, he has failed to show grounds for relief on this issue.

We review unpreserved claims for plain error. Jones v. United States, 527 U.S. 373, 389 (1999). To grant relief, we must find (1) error, (2) that is plain, and (3) affects substantial rights. Id. Moreover, "[a]n appellate court should exercise its discretion to correct plain error only if it seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Id. (citations and quotations omitted). Thus, when we exercise

-16-

plain error review of a prosecutor's alleged vouching, we will weigh the seriousness of the vouching in light of the context of the entire proceeding, including the strength of the district court's curative instructions and the closeness of the case.  United States v. Harlow, 444 F.3d 1255, 1261 (10th Cir. 2006).

We have stated that it is a due process error for a prosecutor to indicate a personal belief in a witness' credibility, either by personally assuring the jury of the witness' veracity or by implicitly representing that information not presented to the jury supports the witness' testimony.  United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990). But we have allowed prosecutors to refer to plea agreements and their truthfulness provisions on direct examination.  Id. at 1499; United States v. Lord, 907 F.2d 1028, 1031 (10th Cir. 1990).  Moreover, "[u]se of the 'truthfulness' portions of these agreements becomes impermissible vouching only when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony."  Bowie, 892 F.2d at 1498.

Lettig asserts that the prosecutor indicated a personal belief in the witnesses' testimony by frequently referring to himself in the first person.  The prosecutor's statements, Lettig claims, effectively assured the jury of the witnesses' veracity, based upon the prosecutor's personal involvement in the plea negotiations.  Lettig also asserts that the prosecutor's use of the word "we" was similarly problematic because it placed the government's prestige behind the witnesses' testimony.

We recently had occasion to reject a vouching claim in an analogous case.  In

-17-

United States v. Jones, the defendant objected to the prosecutor's use of "I" and "we" in closing arguments. 468 F.3d 704, 708 (10th Cir. 2006). After noting that "the use of personal pronouns in closing argument is not a *per se* due process violation," we held that the prosecutor's occasional use of the first person did not "cross the line." Id. As in Jones, the government's use of first person pronouns here did not imply that the government stood behind the witnesses' testimony. Review of the prosecutor's statements reveals his admonition that the jury has the obligation to independently assess the testimony presented and that the prosecutor's only function was to introduce evidence.

The context in which the prosecutor made his challenged statements further illuminates their propriety: the prosecutor's statements were made to clarify the plea bargaining process in response to Lettig's assertions that the accomplices' plea agreements motivated them to testify falsely. Moreover, the district court informed the jury that it must view the accomplices' testimony with great caution and that the accomplices have motivation to lie given the benefits they received in exchange for their testimony (making the government's connection with the witnesses a reason for suspicion, not for comfort).

Lettig also argues that the government vouched for the witnesses' testimony by referring to them as "Deep Throat," witnesses with "inside" knowledge. Again, the prosecutor made this statement when explaining the plea bargaining process to the jury in response to Lettig's assertion that the plea agreements motivated the accomplices to

testify falsely. Describing the witnesses as "Deep Throat" no more vouched for the witnesses' veracity than did the prosecutor's references to himself in the first person.

Thus, the prosecutor did not impermissibly indicate a belief in the witnesses' testimony. Because the prosecutor did not impermissibly vouch for the accomplices, we reject Lettig's related assignment of cumulative error. Accordingly, we hold that Lettig has failed to show grounds for reversal and his convictions are

AFFIRMED.

Entered for the Court


William J. Holloway, Jr.
Circuit Judge