F I L E D
United States Court of Appeals
Tenth Circuit

JAN 16 2003

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

DENNIS MCCLATCHEY,

Defendant - Appellee.

No. 01-3327

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 98-CR-20030-06-JWL)

Thomas M. Gannon, Attorney, Department of Justice, Washington, D.C. (James E. Flory, United States Attorney, District of Kansas, Tanya J. Treadway, Assistant United States Attorney, Kansas City, Kansas; William H. Bowne, Trial Attorney, Department of Justice, Washington, D.C., with him on the briefs), for Plaintiff-Appellant.

Charles W. German of Rouse Hendricks German May PC, Kansas City, Missouri, for Defendant-Appellee.

Before **HENRY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **HARTZ**, Circuit Judge.

**HARTZ**, Circuit Judge.

A jury convicted Dennis McClatchey, a hospital executive, of one count of conspiracy and one count of violating the Medicare Antikickback Act, for his role in the hospital's payments to two doctors for referring patients to the hospital. The district court granted McClatchey's post-verdict motion for judgment of acquittal on both charges. We reversed the district court's judgment in *United States v. McClatchey*, 217 F.3d 823 (10th Cir. 2000) (*McClatchey I*), and remanded with instructions to reinstate the jury's verdict against McClatchey.

This appeal concerns the sentence imposed on remand. The government appeals the sentence, contending that (1) the district court miscalculated McClatchey's offense level by using an excessively low figure for the net amount of unlawful referral payments attributable to McClatchey, and (2) the district court improperly departed downward from the prescribed offense level on the grounds of extraordinary family circumstances and aberrant behavior. We have jurisdiction under 18 U.S.C. § 3742(b). We affirm the district court's calculation of the offense level, reverse the downward departure, and remand for resentencing.

## I. BACKGROUND

Facts relating to this case have previously been set forth in our first opinion, *McClatchey I*, 217 F.3d at 826-829, our related opinion in *United States v. LaHue*, 261 F.3d 993, 997-1001 (10th Cir. 2001), *cert. denied*, 122 S. Ct. 818, 819 (2002), and the district court's opinion in *United States v. Anderson*, 85 F. Supp. 2d 1047, 1052-61 (D.

Kan. 1999). We summarize here those facts relevant to the present appeal.

The gist of the offense was that Baptist Medical Center (Baptist) paid doctors Robert and Ronald LaHue to refer patients to Baptist. Such referral fees violate the Medicare Antikickback Act's prohibition against "knowingly and willfully offer[ing] or pay[ing] any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service for which payment may be made . . . under a Federal health care program . . . ." 42 U.S.C. § 1320a-7b(b)(2)(A).

During the pertinent period McClatchey served as Chief Operating Officer and Senior Vice President of Baptist, and then as a Senior Vice President at Health Midwest, which was Baptist's parent corporation at the time. The LaHues were the principals of a medical practice called Blue Valley Medical Group (BVMG), which provided care to patients in nursing homes and similar facilities.

In January 1985 Baptist entered into a one-year contract with the LaHues, paying the doctors a total of $150,000 to serve as "Co-Directors of Gerontology Services" at Baptist. Baptist's Chief Financial Officer testified that the negotiations for the 1985 contract had been "backwards," in that the parties first set the fee and only then agreed to the services which the LaHues would provide in return. After the contract was executed, the LaHues began referring large numbers of their patients to Baptist.

In June of 1986, after the 1985 contract had expired, Baptist entered into a second

one-year agreement with the LaHues, providing that Baptist would pay the doctors a combined $150,000 to perform specified services. Then, despite expiration of the 1986 contract, Baptist continued to pay the LaHues $150,000 each year through 1993, with the exception of 1990, when each doctor received $68,750. The LaHues performed only "minimal" services for Baptist. *Anderson*, 85 F. Supp. 2d at 1056, 1062, 1069.

In addition to paying cash to the LaHues, Baptist also provided an employee. In the summer of 1985, at the request of the LaHues, Baptist's Chief Executive Officer Dan Anderson "loaned" Tom Eckard to the LaHues to help them manage their practice. Despite Eckard's official title as Baptist's "Director of Geriatric Services," he worked at BVMG and in effect served as BVMG's manager. Based on his discussions with McClatchey and other Baptist officials, Eckard understood that his primary job responsibility was to maintain a positive relationship between BVMG and Baptist, "in order to assure that the flow of patients to the hospital would continue." *Anderson,* 85 F. Supp. 2d at 1055. Baptist, not BVMG, paid Eckard's salary. This arrangement continued until March 1993.

In the summer of 1991, after Baptist merged into Health Midwest, the new attorney for Baptist discussed with McClatchey and other Baptist officials the need to draft a new contract with the LaHues, because the 1986 contract did not meet safe harbor regulations under the Medicare Antikickback Act. McClatchey oversaw the negotiations for a new contract. During the course of these negotiations, in late 1991 or early 1992,

-4-

McClatchey "learned that the LaHues had not been performing some of the services specified in the 1986 contract and that certain staff members at Baptist were not interested in having the LaHues perform such services." *McClatchey I*, 217 F.3d at 828. Also during the negotiations, the LaHues informed McClatchey and others at Baptist that they would not accept a proposed contractual provision requiring them to perform a minimum number of hours of services for Baptist. The contract ultimately executed in April 1993 contained no minimum-hour provision. Under this contract Baptist again agreed to pay the LaHues $150,000.

Months before execution of the contract, on November 5, 1992, an FBI Agent and Medicaid Fraud Investigator questioned McClatchey and Baptist CEO Anderson about Baptist's relationship with BVMG, specifically seeking information about the fees paid to the LaHues and the Eckard arrangement. Shortly thereafter, Baptist retained attorneys specializing in civil and criminal health care fraud cases, who recommended that Eckard immediately be removed from Baptist's payroll and placed on BVMG's payroll. It was McClatchey's responsibility to fix the Eckard arrangement. When it became clear that BMVG would not pay for Eckard's services, McClatchey decided to bring Eckard back to Baptist, effective March 1, 1993.

In October 1993 McClatchey left Baptist to become Senior Vice President of Corporate Relations at its parent, Health Midwest. The next month the LaHues notified Baptist that they were terminating the 1993 contract, due to the anticipated sale of

BVMG. Health Midwest executives, including McClatchey, began discussing a strategy to replace the BVMG patients they anticipated losing upon termination of the LaHue relationship. When the sale of BVMG fell through, Baptist and the LaHues continued their relationship under two temporary contracts. Baptist's relationship with the LaHues finally ended in January 1995.

McClatchey was indicted on July 15, 1998, for conspiring to violate the Medicare Antikickback Act, and for a substantive violation of the Act. The jury returned guilty verdicts on both charges. Following the verdict, the district court granted McClatchey's motion for acquittal.

We reversed. Although we agreed with the district court that "no reasonable jury could find beyond a reasonable doubt that McClatchey specifically intended to violate the Act based on the evidence of his involvement, or non-involvement, in the 1985 contract, the 1986 contract, and the loan of Eckard to BVMG," we disagreed "with the district court's assessment of the evidence concerning McClatchey's negotiation of the 1993 contract." *McClatchey I*, 217 F.3d at 829. Because the evidence presented at trial showed that McClatchey (1) knew as soon as late 1991 or early 1992 that the LaHues had not performed substantial services required under the prior contracts, (2) knew that some Baptist staff members did not want the LaHues to perform such services, and (3) understood the importance to Baptist of the LaHues' patient referrals, we concluded, "The evidence concerning McClatchey's involvement in negotiating the 1993 agreement

-6-

thus gives rise to a reasonable inference that he knowingly, voluntarily, and purposefully entered into an agreement with the specific intent to induce the LaHues to refer their Medicaid patients to Baptist." *Id.* at 831. We therefore set aside the district court's judgment of acquittal and remanded with instructions to reinstate the jury's verdict against McClatchey.

On remand the district court calculated McClatchey's offense level as 13 under the United States Sentencing Guidelines (USSG). The court then granted him a 3-level downward departure on three grounds: (1) extraordinary family circumstances; (2) aberrant behavior; and (3) "most strongly" for a combination of family circumstances and aberrant behavior. Aplt.'s App. at 943. The district court sentenced McClatchey to three years' probation, with home detention of six months under electronic monitoring, and imposed a $30,000 fine and related costs. The government appeals the sentence, challenging the calculation of the offense level and the propriety of the downward departure.

## II. ANALYSIS

### A. Calculation of the Offense Level

In computing McClatchey's offense level under the version of the Sentencing Guidelines in effect at the time of his sentencing, the district court properly applied USSG § 2B4.1, entitled "Bribery in Procurement of Bank Loan and Other Commercial Bribery." The base offense level under that Guideline is 8; if the bribe exceeded $2,000,

the district court is instructed to increase that level by the "number of levels from the table in § 2F1.1." USSG § 2B4.1(b)(1).  (Amendment 617 of the Guidelines, effective November 1, 2001, deleted § 2F1.1 and moved its substance to § 2B1.1.  Because McClatchey was sentenced in September 2001, that amendment does not govern this case.  See *United States v. Williams,* 292 F.3d 681, 685 n.2 (10th Cir. 2002) ("in general, we apply the Guidelines provisions in effect at the time of sentencing").)  The district court found that the bribe was $50,000, and added 5 to the offense level.  USSG § 2F1.1(b)(1)(F).  The government challenges the $50,000 figure, contending that the bribe was $1.2 million, or at least $340,000.  As a result, the offense level would need to be increased by from 8 to 11 levels, rather than only by 5.  USSG § 2F1.1(b)(1)(I) and (L).

Both parties agree that the amount of the bribe should be calculated as the amount paid to the LaHues less the value of the lawful services they provided.  They disagree on which bribes McClatchey bears responsibility for (that is, what part of the unlawful conduct is relevant to sentencing McClatchey), and the value of the LaHues' services.

1. *Relevant Conduct*

The Sentencing Guidelines state which acts and omissions are to be considered in determining the offense level used in sentencing the defendant.  The governing rules are set forth in USSG § 1B1.3, entitled "Relevant Conduct (Factors that Determine the Guideline Range)."  For a crime such as the one here—"a jointly undertaken criminal

activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)"—relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG 1B1.3(a)(1)(B). *See United States v. Tagore*, 158 F.3d 1124, 1129 (10th Cir.1998).

For assistance in interpreting the Guideline language, we turn to the commentary to the Guideline. Commentary that explains a guideline "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). The commentary to USSG § 1B1.3 states that "the focus is on the specific acts and omissions for which the defendant is to be held accountable . . . , rather than on whether the defendant is criminally liable for an offense as a . . . conspirator." USSG § 1B1.3, comment. (n.1). Indeed, a defendant's jointly undertaken criminal activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." *Id*., comment. (n.2). Thus, "the court must first determine *the scope of the criminal activity the particular defendant agreed to jointly undertake* (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement)." *Id*. (emphasis added). "Proper attribution at sentencing requires the district court to analyze, and make particularized findings about, the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a

whole." *United States v. Melton*, 131 F.3d 1400, 1404 (10th Cir. 1997) (internal quotation marks omitted).

The government must prove by a preponderance of the evidence the factual basis for attributing the conduct of coconspirators to the defendant for sentencing purposes. *United States v. Tran*, 285 F.3d 934, 938 (10th Cir. 2002). In this case the district court found that "the evidence presented at trial showed, by a preponderance of the evidence, that Mr. McClatchey agreed only to jointly undertake the crime of paying bribes through the 1993 contract." Aplt.'s App. at 912. Accordingly, the court considered only the bribe paid under that contract in determining the sentence.

We review the sentencing court's fact findings for clear error. *See Melton*, 131 F.3d at 1403. "To constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge." *United States v. Torres*, 53 F.3d 1129, 1144 (10th Cir. 1995).

The government argues that the district court's finding contravenes our holding in *McClatchey I*. It contends that we held in *McClatchey I* that McClatchey joined the pay-for-patients referral conspiracy beginning in the summer of 1991, when he oversaw the negotiations for the 1993 contract. Thus, the government asserts, "once it is accepted that McClatchey was a member of the conspiracy, his culpability is not measured by his 'relevant conduct found by a preponderance of the evidence,' as the district court stated

. . ., but instead by the relevant conduct of the other conspirators that was 'reasonably foreseeable to him.'" Aplt.'s Opening Br. at 24. That conduct, in the government's view, encompasses not just bribes paid under the 1993 contract, but all illegal payments to the LaHues from the summer of 1991 forward, including (1) payments under the 1986 contract, (2) Eckard's salary, (3) payments under contracts with the LaHues executed after McClatchey left Baptist in October of 1993, and (4) various "sweetheart" deals between Baptist and the LaHues. According to the government, the combined value of these payments exceeded $1.2 million, which would result in an 11-level increase in McClatchey's offense level under former USSG § 2F1.1(b)(1)(L).

The government misperceives the nature of the inquiry under USSG § 1B1.3. Although we stated in *McClatchey I* that the evidence at trial supported McClatchey's conviction as a member of the conspiracy to violate the Antikickback Act, *McClatchey I*, 217 F.3d at 831, such a determination, by itself, is not sufficient to hold him responsible for all reasonably foreseeable bribes paid by his coconspirators. *See Melton*, 131 F.3d at 1405. Relevant conduct is limited to those reasonably foreseeable bribes that are part of the criminal activity McClatchey "agreed to jointly undertake." USSG § 1B1.3, comment. (n.2); *see Tagore*, 158 F.3d at 1129; *Melton*, 131 F.3d at 1405. The scope of McClatchey's jointly undertaken criminal activity "is not necessarily the same as the scope of the entire conspiracy." USSG § 1B1.3, comment. (n.2). In particular, "[t]he fact that the defendant is aware of the scope of the overall operation is not enough to

[establish the scope of the defendant's agreement] and therefore, is not enough to hold him accountable for the activities of the whole operation." *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002).

Our opinion in *McClatchey I* did not determine the precise boundaries of the criminal activity McClatchey agreed "to jointly undertake." All it did was hold that the jury verdict against him had to be sustained because there was sufficient evidence that he conspired to have Baptist and the LaHues enter into the improper 1993 contract.

We recognize that a reasonable person could have found that McClatchey had agreed to all improper payments to the LaHues beginning as early as some time in 1991. But the evidence hardly compelled such a finding. Determining the "specific conduct and objectives embraced by [McClatchey's] agreement," USSG § 1B1.3, comment. (n.2), is not a matter of scientific precision. Different reasonable people could view the circumstantial evidence differently. We find no clear error in the district court's finding regarding the scope of McClatchey's relevant conduct.

2. *The Value of the Bribe Under the 1993 Contract*

Having determined that it was not clear error for the district court to limit McClatchey's relevant conduct under USSG § 1B1.3 to bribes paid under the 1993 contract, we turn to the government's contention that the district court clearly erred in calculating the value of the bribe paid under that contract. The payment to the LaHues under the contract was $150,000. The issue is the value of any services performed by the

LaHues in return.

At the sentencing of McClatchey's codefendant Dan Anderson, the district court decided that the LaHues rendered $100,000 worth of services to Baptist each year between 1986 and 1994, but were paid $150,000 annually. Therefore, the court concluded, "at least $50,000," though "probably more," of the money paid to the LaHues each year was a bribe. Aplt.'s App. at 892. The district court adopted this finding at McClatchey's sentencing, and concluded that the value of the bribe paid under the 1993 contract was $50,000.

The government contends that the district court's bribe calculation was clearly erroneous. It asserts that the entire $150,000 paid under the 1993 contract was a bribe, because the LaHues performed virtually no services for Baptist. It points out that in the district court's July 21, 1999, opinion granting McClatchey's judgment of acquittal, the court stated with respect to the 1986 contract that the doctors "performed only minimal services under the contract." *Anderson*, 85 F. Supp. 2d at 1056; *see id.* at 1062, 1069.

The government does not, however, suggest any reason why the court could not reassess the evidence at the time of sentencing. We may reverse the district court's valuation of the bribe as clearly erroneous only if it is implausible in light of the entire record on appeal. *Torres*, 53 F.3d at 1144. That is not the case here. As the government concedes, there is "evidence in the record suggesting that the LaHues performed substantial services for Baptist." Aplt.'s Reply Br. at 6. Indeed, the record contains

direct support for the district court's specific finding that the value of the services the LaHues rendered was worth $100,000 per year. In determining the value of those services, the district court relied on a 1986 memorandum from Ron Keel, an operations vice president at Baptist, that recommended reducing payments to the LaHues from $150,000 to $100,000 per year. The court stated that Mr. Keel was "the individual at Baptist closest to the relationship [with the LaHues] and was in the best position to put a ceiling on the value to Baptist of whatever legitimate services the LaHues were performing." Aplt.'s App. at 890-91. Other evidence in the record also supports the $100,000 figure. Dr. Nevada Lee, medical director of Baptist's clinic from 1985-1992, testified that she observed the LaHues perform a number of services for the hospital, and that she believed payments of $1 million over ten years for those services was "a very fair deal." Aplee.'s Supp. App. at 404. Various doctors and nurses also testified that the LaHues performed important services for Baptist.

To be sure, as the district court recognized, there was also "ample testimony" that the LaHues performed minimal services for Baptist. Aplt.'s App. at 890. Nevertheless, as described above, there was evidence supporting the district court's conclusion that the LaHues rendered services worth $100,000. We therefore cannot say that the district court's determination of the value of the bribe paid under the 1993 contract was clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them

-14-

cannot be clearly erroneous.").

B. <u>Downward Departure</u>

The district court granted McClatchey a 3-level downward departure from the Guideline range on three grounds: (1) extraordinary family circumstances, (2) aberrant behavior, and (3) a combination of the two factors. The government contends that none of these grounds supports a downward departure in this case. "We review departures from the guidelines under a unitary abuse-of-discretion standard, giving deference to essentially factual questions and plenary review to those that are essentially legal." *United States v. Concha*, 294 F.3d 1248, 1251 (10th Cir. 2002).

1. *Extraordinary Family Circumstances*

The Sentencing Guidelines state that a defendant's "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." USSG § 5H1.6. In other words, family circumstances are a permissible but discouraged ground for departure under the Guidelines. *United States v. Gauvin,* 173 F.3d 798, 807 (10th Cir. 1999). "[A] district court may depart based on [a factor that is permissible but discouraged] 'only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present.'" *Id.* (*quoting Koon v. United States*, 518 U.S. 81, 96 (1996)).

The family circumstance relied upon by the district court was the condition of

McClatchey's 22-year-old son, who had been diagnosed with "attention deficit hyperactivity disorder, severe; obsessive compulsive disorder; paraphilia, not otherwise specified, a sexual disturbance; disruptive behavior disorder; mixed personality with antisocial and narcissistic and obsessive/compulsive features; and irritability." Aplt.'s App. at 946. The district court found that the son's condition created an exceptional situation because his "severe psychological disabilities" placed him "in need of constant care and supervision." *Id*. at 945-46. The court relied on letters from the son's psychiatrist, who had been treating him since 1996. According to the psychiatrist, "McClatchey's presence in the home has been necessary in order to maintain [his son] outside of a residential and/or hospital environment." Aplee.'s Supp. App. at 623. In a January 17, 2001, letter to the district court, the psychiatrist stated:

> [The son requires] ongoing management in order to preclude self
> destructive and/or acting out behavior that could lead to serious
> consequences. . . . [and] ongoing management and structure provided by
> his father and mother in order to maintain his mental and behavioral
> stability. His father is needed for the stability of the household on an
> ongoing basis.

*Id*. at 624-25. In a follow-up letter to the court dated February 22, he added:

> One or the other parent has to be directly involved in transporting him to
> work, assuring that he takes care of his daily needs, assuring that he makes
> appointments. . . . It has been necessary for both parents to be involved as
> it is in fact necessary for one or the other parent[] to be helpful to monitor
> [the son's] doctor and dentist appointments, job interviews, etc., including
> getting his hair cut. Mrs. McClatchey works full time and is unable to
> monitor him on an ongoing basis and maintain her job. It has been
> necessary for both parents to be involved in order to trade off to assure that
> [the son] is maintained in the community. If the parents were not directly

-16-

involved no doubt [the son] would risk becoming a burden on the State for support and monitoring. . . . A family team of both mother and father have been necessary in order to assure that [the son's] ongoing care is maintained. Neither parent in my opinion would be able to manage [the son] in the home environment alone.

*Id*. at 622-23.

The son's need for management, structure, and support in his daily routine does not, however, justify a downward departure. The fact that a defendant cares for a family member with a mental or physical disability is not by itself sufficient to make the circumstances "exceptional." Our decision in *United States v. Archuleta*, 128 F.3d 1446 (10th Cir. 1997), is instructive. There, the defendant was the sole support of two children and his diabetic mother. *Id*. at 1450-52. In determining that the defendant was not among the "rare cases" warranting a downward departure for extraordinary family circumstances, *id*. at 1452, we noted that the record failed to establish that other family members could not care for the defendant's mother, or that home nursing or some other means of care was unavailable. *Id*. at 1450. We quoted with approval the following passage from *United States v. Brand*, 907 F.2d 31, 33 (4th Cir. 1990):

> A sole, custodial parent is not a rarity in today's society, and imprisoning such a parent will by definition separate the parent from the children. It is apparent that in many cases the other parent may be unable or unwilling to care for the children, and that the children will have to live with relatives, friends, or even in foster homes.

*Archuleta*, 128 F.3d at 1451.

*Archuleta* is consistent with the case law of other circuits, which have reversed

-17-

family-circumstances departures absent evidence that the defendant was the only individual able to provide the assistance a family member needs. *See, e.g.*, *United States v. Sweeting*, 213 F.3d 95, 107 (3d Cir. 2000) (defendant was single mother of five children, including a son with Tourette's Syndrome; departure reversed where "there is nothing in the record suggesting that [defendant] (and only [defendant]) can provide [the son] with the care and attention he needs"); *United States v. Allen*, 87 F.3d 1224, 1225-26 & n.1 (11th Cir. 1996) (defendant was primary caretaker of father with Alzheimer's and Parkinson's diseases; in reversing departure, court noted that defendant "is not the only family member available to care for her father"); *cf. United States v. Rybicki*, 96 F.3d 754, 758-59 (4th Cir. 1996) (reversing departure where defendant was responsible for wife with mental health problems and young son with neurological problems who needed "special supervision"; responsibility to family not present to "exceptional" degree); *United States v. Brown*, 29 F.3d 953, 961 (5th Cir. 1994) (reversing departure because "exceptional circumstances" not present; defendant was single mother of two young children with "some undefined medical problems" who would have to live with their great-grandmother).

The district court relied upon *United States v. Sclamo*, 997 F.2d 970 (1st Cir. 1993), in which the First Circuit upheld a departure where the defendant had developed a "special and crucially important" relationship with his girlfriend's 12-year-old son, who had become psychologically impaired after abuse by his alcoholic biological father. *Id.*

-18-

at 972. The son's psychologist had stated that the defendant was the son's "only available resource for positive male bonding"; the defendant played "a major positive role in [the son's] therapy"; the defendant's presence in the home was necessary for the continued improvement of the son's condition; and without the defendant's presence, the son's condition would deteriorate. *Id.*

The departure in *Sclamo*, however, rested upon the existence of a "critical and unique" emotional bond between the defendant and a family member. *Sclamo*, 997 F.2d at 974. In contrast, the psychiatrist for McClatchey's son did not refer to any critical and unique emotional bond between McClatchey and his son, but rather on the assistance that McClatchey and his wife provide in structuring the son's day and helping him perform daily tasks, such as "monitor[ing his] doctor and dentist appointments, job interviews, etc., including getting his hair cut." Aplee.'s Supp. App. at 622-23. There is no evidence that McClatchey, and only McClatchey, can provide the help that his son needs. *See Sweeting*, 213 F.3d at 105. Rather, the record counters this notion. According to the son's psychiatrist, "[o]*ne or the other parent* has to be directly involved in transporting [the son] to work, assuring that he takes care of his daily needs, assuring that he makes appointments." Aplee.'s Supp. App. at 622 (emphasis added). Apparently, McClatchey's assistance is required not because he is an irreplaceable part of his son's treatment, but because McClatchey's wife "works full time and is unable to monitor [their son] on an ongoing basis and maintain her job." *Id.* at 623.

-19-

Even if Mrs. McClatchey had to quit her job to care for her son, such a family sacrifice would be insufficient to justify a downward departure, because "[d]isruptions of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." *Sweeting*, 213 F.3d at 102 (internal quotation marks omitted); *see United States v. Rodriguez-Velarde*, 127 F.3d 966, 968 (10th Cir. 1997) ("the disintegration of existing family life or relationships . . . is to be expected when a family member engages in criminal activity that results in a period of incarceration") (internal quotation marks omitted). In any event, the record reflects that prior to McClatchey's conviction, both he and his wife worked full-time. This belies any contention that McClatchey's constant presence in the home is an indispensable part of his son's care, or that one or the other parent must be with their son at all times to assist him in his daily routine.

Finally, there is nothing about the type of care that McClatchey provides (driving, monitoring his son's appointments, etc.) that suggests that another individual could not provide the necessary assistance in McClatchey's absence. *See United States v. Pereira*, 272 F.3d 76, 82 (1st Cir. 2001) ("The nature of the care that [defendant] renders (shopping, cleaning, food preparation, etc.) is not so highly specialized as to make him difficult to replace."); *Sweeting,* 213 F.3d at 105 (while defendant assisted her son with his daily exercise therapy, medication, shopping, and homework, "there simply is nothing about the type of care that he requires that suggests to us that it is so unique or

burdensome that another responsible adult could not provide the necessary supervision and assistance in [defendant's] absence"). Given McClatchey's net worth of more than $1 million, additional caregivers could be hired to assist if necessary. *Cf. Archuleta*, 128 F.3d at1450-51 (departure reversed where record silent as to availability of alternate caregivers).

This case is a far cry from what we described in *Gauvin*, 173 F.3d at 807-08. The defendant in that case was the father and support for his wife and four young children. To replace the defendant's income during his incarceration, the wife needed to work 14 hours a day and be away from home (because of commuting time) 16 hours a day. Her absence from home had led to an investigation by the Navajo Housing Authority regarding whether she should retain custody of her children. There was no extended family to care for the children. By contrast, McClatchey has not shown any risk that his wife and son cannot be well cared for in his absence, and the only breach in family bonds would be the absence of McClatchey during his incarceration.

Thus, our sympathy for McClatchey's son cannot justify a reduction in the penalty McClatchey would otherwise be required to suffer for his criminal conduct. The circumstances here are insufficiently extraordinary to warrant departure on this "discouraged" basis.

### 2. *Aberrant Behavior*

The district court's second ground for granting McClatchey a downward departure

from the Guideline sentencing level was that his criminal conduct was totally out of character. Its determination that McClatchey's behavior had been aberrant was based on a number of factors: (1) McClatchey's previously law-abiding life; (2) a lack of "direct pecuniary gain" from his crime, Aplt.'s App. at 957; (3) his education and long history of successful employment; (4) his "impeccable" performance on bond and "cooperative attitude throughout" the government's investigation, *id.*; (5) letters written on his behalf praising his honesty, integrity, and good character; and (6) his charitable contributions and community service.

The district court likely would not have granted this departure under the current applicable Guideline. Effective November 1, 2000, USSG § 5K2.20 expressly authorizes departures for aberrant behavior only in "extraordinary" cases. The comment to the Guideline defines aberrant behavior as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." USSG § 5K2.20, comment. (n.1).

The parties stipulated, however, that the 1998 version of the Sentencing Guidelines applies to this issue. The only mention of aberrant behavior in that version was the following sentence from the Introduction (which dates to the original 1987 version of the Guidelines): "The Commission, of course, has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through

-22-

departures." USSG Ch.1, Pt. A, intro. para. 4(d). This language was enough for us to conclude that the "aberrance of a criminal act is an encouraged factor for departure." *United States v. Talk*, 158 F.3d 1064, 1072 (10th Cir. 1998).

Under the pre-2000 Guidelines, we held that a determination of aberrant behavior was to be made by evaluating "the totality of circumstances," except that the determination could not be based on "impermissible factors" that the Guidelines do not allow to be considered for departure (such as "forbidden factors" and "discouraged factors that are not present to some exceptional degree"). *United States v. Benally*, 215 F.3d 1068, 1073 (10th Cir. 2000) (internal quotation marks omitted). "[T]he permissible factors in this context must illustrate some unique circumstance—some element of abnormal or exceptional behavior—beside the fact the defendant has never before committed the crime." *Id*. at 1074. In reviewing the district court's decision to depart, we bear in mind that because the "district court is in the better position to determine whether the defendant's offense conduct is out of character for that individual . . . , the district court's resolution of this largely factual question is due substantial deference." *United States v. Garcia*, 182 F.3d 1165, 1176 (10th Cir. 1999) (internal quotation marks omitted).

Despite our deference to the district court's evaluation of McClatchey's character, we cannot affirm the downward departure in his offense level. The chief reason for our ruling is the duration of McClatchey's criminal conduct. Before addressing that point,

however, we examine the factors relied upon by the district court for departing on this basis to determine whether, even if supported by the evidence, they are properly considered.

First, although McClatchey's prior law-abiding life is a prerequisite for granting an aberrant-behavior departure, it does not in itself distinguish him from other first offenders and is not a permissible factor to consider in granting such a departure. *Benally*, 215 F.3d at 1074. Next, the fact that McClatchey did not receive "direct pecuniary gain" could be an important consideration, *see Benally*, 215 F.3d at 1074; but it is offset by the fact that the *indirect* gain was substantial—he was a highly compensated executive (more than $250,000 per year during the relevant period) of a company whose financial security was closely linked to the success of the referral scheme. We are not inclined to view an executive's conduct benefitting the employer as selfless.

As for McClatchey's education and employment history, both are discouraged grounds for departure under the Guidelines. *See* USSG §§ 5H1.2, 1.5. Unless we are simply to impose lesser penalties on the educated and business elite, there is nothing exceptional about McClatchey's education and enviable career to warrant consideration for downward departure. On the contrary, his background suggests that he should have "known better." Similarly, downward departure cannot be predicated on McClatchey's "totally impeccable" performance on bond and his "cooperative attitude throughout, from

the investigation through his removal from the health care industry." Aplt.'s App. at 957. The court did not find that his compliance with bond conditions was out of the ordinary. Nor did McClatchey's "cooperative attitude" extend so far as to constitute acceptance of responsibility, which permits a 2-level decrease in the offense level, USSG § 3E1.1(a); and downward departure for cooperation is not permitted in the absence of a government motion under USSG § 5K1.1, *see United States v. Maldonado-Acosta*, 210 F.3d 1182, 1184 (10th Cir. 2000). "'"[A]berrant behavior" departure should not be utilized as a "back door" through which [otherwise inappropriate] factors may enter into the sentencing determination.'" *Benally*, 215 F.3d at 1073 (quoting *United States v. Bush*, 126 F.3d 1298, 1301 n.2 (11th Cir. 1997)) (brackets in *Benally*).

That leaves McClatchey's charitable and community service and his good-character references. Charitable giving and community service are discouraged factors for departure under the Guidelines, USSG § 5H1.11; and we expect the district courts to view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses. As one court has said, "[I]t is *usual* and *ordinary*, in the prosecution of similar white-collar crimes involving high-ranking corporate executives . . . , to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." *United States v. Kohlbach*, 38 F.3d 832, 838 (6th Cir. 1994) (defendant convicted of conspiracy to sell adulterated orange juice). Likewise, excellent character references are not out of the ordinary for an executive who

commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her. Nevertheless, we defer to the district court's findings that McClatchey's charitable and community work was exceptional, *see United States v. Crouse*, 145 F.3d 786, 790 (6th Cir. 1998), and that he had displayed the strictest standards of honesty and integrity.

These two factors, however, do not suffice to qualify McClatchey for a downward departure for aberrant behavior. As previously indicated, his criminal conduct simply lasted too long. Although "this circuit has never held that application of the aberrant behavior downward departure requires the crime at issue to have been spontaneous," *Garcia*, 182 F.3d at 1176, behavior is aberrant only if it represents "a *short-lived*, marked departure from an otherwise law-abiding life." *United States v. Alvarez-Pineda*, 258 F.3d 1230, 1240 (10th Cir. 2001) (emphasis added; applying pre-§ 5K2.20 Guidelines).

Even assuming that McClatchey's involvement in the patient-referral scheme represented a "marked departure from an otherwise law-abiding life," *id*. (internal quotation marks omitted), by no means can his participation in the scheme be deemed *short-lived*. Consider McClatchey's involvement in the drafting of the 1993 contract. In August 1991 he was alerted to the need to avoid excessive payments to the LaHues when a hospital attorney informed him that a new contract with the LaHues was required to ensure compliance with the Antikickback Act. McClatchey then oversaw the contract negotiations. The attorneys prepared at least 11 drafts of the agreement between

-26-

December 1991 and April 1993. Early in the process McClatchey learned that the possibility of kickbacks was not just theoretical. As we stated in *McClatchey I*, "in late 1991 or early 1992, McClatchey . . . learned that the LaHues had not been performing some of the services specified in the 1986 contract and that certain staff members at Baptist were not interested in having the LaHues perform such services." 217 F.3d at 828. McClatchey received a particularly strong warning signal in November 1992, when an FBI Agent and Medicare Fraud Investigator spoke with him about Baptist's relationship with the LaHues. Yet the drafts of the agreement continued to omit any requirement that the LaHues provide a minimum number of hours of service to Baptist. The agreement was executed in April 1993, and payments were made during the remainder of McClatchey's tenure at Baptist, which continued until his move to Health Midwest in October of that year. If McClatchey joined a conspiracy to violate the Antikickback Act, he must have done so over a period of many months.

Given the length of his involvement, McClatchey's criminal conduct cannot be considered "aberrant." Our conclusion finds support in cases from other circuits that, applying pre-§ 5K2.20 law, had also rejected a spontaneity requirement and adopted a "totality of the circumstances" approach for determining whether conduct is aberrant. *See United States v. De Jesus*, 211 F.3d 153, 157 (1st Cir. 2000) (departure not warranted given "deliberateness and duration" of defendant's conduct); *United States v. Martinez*, 207 F.3d 133, 137 (2d Cir. 2000) (rejecting departure for defendant who

engaged in 13-month drug importation scheme, and noting that "the activity in question . . . certainly does not constitute a *short-lived* departure" from an otherwise law-abiding life); *Zecevic v. United States Parole Comm'n*, 163 F.3d 731, 736 (2d Cir. 1998) (although defendant had previously been law-abiding and employed, and his criminal behavior "shocked" his family, defendant's behavior not aberrant where he "initiated an elaborate scheme to smuggle drugs into Sweden and carried out that plan over the course of several months"); *United States v. Colace*, 126 F.3d 1229, 1232 (9th Cir. 1997) (11-week crime spree involving numerous bank robberies precluded aberrant behavior departure); *United States v. Green*, 105 F.3d 1321, 1323 (9th Cir. 1997) (suggesting departure not appropriate where defendant's involvement in drug manufacturing operation lasted "at least a few months").

Accordingly, we hold that the district court erred when it granted McClatchey a downward departure based on aberrant behavior.

### 3. *Combination of Factors*

Finally, the district court noted that if McClatchey's family circumstances or aberrant behavior alone did not warrant a downward departure, then those two factors combined justified the departure. We affirmed a downward departure on the basis of a combination of aberrant behavior and family circumstances in *United States v. Pena*, 930 F.2d 1486, 1494-95 (10th Cir. 1991). That case appears to be distinguishable on its facts. The evidence was stronger than in this case in showing both aberrant behavior (the

-28-

offense was based on defendant's driving marijuana from the border on one occasion) and the adverse impact of incarceration on other members of the family (defendant was the sole support for her two-month-old child and two-month-old grandchild). More importantly, *Pena* predated the following comment in the Guidelines (which first appeared in 1994):

> The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of . . . characteristics and circumstances [that are not ordinarily relevant], differs significantly from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. *However, the Commission believes that such cases will be extremely rare.*

USSG § 5K2.0 comment. (emphasis added).

This is not such a case. As discussed above, there is little support for a departure on the ground of aberrant behavior, and there is no evidence that the impact on the family would be substantially greater than when any parent is incarcerated. "Combining the legally impermissible and factually inappropriate grounds for departure cannot make this case one of the 'extremely rare' cases contemplated by § 5K2.0." *United States v. Contreras*, 180 F.3d 1204, 1213 (10th Cir. 1999).

III. **CONCLUSION**

We REVERSE McClatchey's sentence and REMAND to the district court to impose a sentence using an offense level of 13.