**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 26, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ALEXANDER SUTTON,

    Defendant - Appellant.

No. 23-2022
(D.C. No. 1:22-CR-01390-KWR-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **EID**, and **ROSSMAN**, Circuit Judges.
_____

For nearly seven years, information-technology employee Alexander Sutton

used payment processors to illegally divert about half a million dollars from his

employer, a small non-profit wellness center, into his personal accounts.  After

Sutton pleaded guilty to wire fraud, the sentencing court imposed two enhancements

on his sentence over his objections, one for causing a "substantial financial hardship"

to a victim under U.S.S.G. § 2B1.1(b)(2)(A)(iii), and another for using "sophisticated

means" to carry out his crime under U.S.S.G. § 2B1.1(b)(10)(C).  Sutton appeals,

arguing that the district court erred because no evidence supported either

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

enhancement.  We find no error and affirm because the record supports the district court's findings underlying the two enhancements.

## I.

Over the course of nine years, Alexander Sutton provided information-technology support for a wellness center in Albuquerque, New Mexico—that is, until the small business fired him because of his substance abuse and unrelated criminal charges.  Following Sutton's exit, the small business noticed a dramatic decrease in sales and reported its concerns to the Albuquerque Police Department.  The Department thereafter referred the matter to the FBI as a potential wire fraud case.  As it turns out, Sutton had been rerouting payments before and after the small business fired him.  For about seven years, he had managed to illegally divert $485,598.42 from the center into several personal accounts.

Sutton pleaded guilty without a plea agreement to one count of wire fraud.  In his Presentence Report, the Probation Office determined that his offense had resulted in substantial financial hardship to a victim, warranting a two-level Sentencing Guidelines increase under U.S.S.G. § 2B1.1(b)(2)(A)(iii).  The Probation Office further determined that Sutton had used sophisticated means to carry out his crime, warranting a second two-level Guidelines increase under U.S.S.G. § 2B1.1(b)(10)(C).  Sutton objected to each of the enhancements.  At sentencing, the district court overruled both of Sutton's objections and explained why the two enhancements apply.

First, relying on the Guidelines' commentary, the district court found that a preponderance of the evidence supported imposing the substantial financial hardship enhancement. For this enhancement, the court took judicial notice of a victim impact statement written by the owner of the small non-profit business, Dr. Sunil Pai. The court relied on the statement to find that, because of Sutton's fraud scheme, the "loss of this money [] not only . . . delayed . . . [Dr. Pai's] ability to retire but it[] affected significantly and substantially his ability to refinance or get lines of credit despite his good credit score." R. Vol. II at 49–50.

The court found that Dr. Pai had been "forced to work longer, which is a change of lifestyle." *Id.* at 50. And not only that, the court found that as a result of the scheme, banks considered Dr. Pai to be a high risk borrower, which "significantly and substantially increas[ed] the level of interest rate . . . , costing him more money long-term." *Id.* The court also found that Dr. Pai had suffered other "financial hits," such as "having to totally restructure his payment platform which is continuing to bother him, costing him money." *Id.* For example, he no longer could use "payment platforms" like "PayPal." *Id.* And lastly, the court found that Dr. Pai could not "afford to expand his building or product lines as he would like to do so." *Id.*

Second, the district court concluded that applying the sophisticated means enhancement was also "appropriate." *Id.* at 56. The court overruled Sutton's objection against this enhancement because he was an "IT person" in "a position to know information otherwise unavailable to others." *Id.* at 55. And due to Sutton's expertise, the district court reasoned that "he was able to navigate payment processor

3

accounts, create accounts, [and] transfer money" to himself in a complex way that would "avoid detection" for a "period of almost seven years." *Id.*; *see id.* at 56 ("He created his own accounts with various payment processors such as PayPal, Stripe, Square and then reset the authorized Shopify account back to the business accounts."). As such, the court concluded that for several years, "his use of multiple accounts" and "technical know-how" allowed Sutton to "evade detection" in a "sophisticated" manner. *Id.* at 56.

In the end, the district court sentenced Sutton to 48 months' imprisonment, a sentence at the higher end of Sutton's Guidelines range of 41 to 51 months, and to three years of supervised release. Sutton timely appealed, challenging the imposition of the two enhancements.

## II.

Sutton objected to both enhancements at his sentencing. "When evaluating the district court's interpretation and application of the Sentencing Guidelines, we review legal questions de novo and factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Mollner*, 643 F.3d 713, 714 (10th Cir. 2011) (citation omitted).

We will only find a factual finding clearly erroneous if the record does not support the finding "or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *United States v. Morales*, 961 F.3d 1086, 1090 (10th Cir. 2020) (citation omitted). In other words, "we must be convinced that the sentencing court's finding is simply not plausible or permissible in

4

light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge." *United States v. McClatchey*, 316 F.3d 1122, 1128 (10th Cir. 2003) (citation omitted). So much so that if "two permissible views of the evidence" exist, "the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

### III.

We first address whether the district court clearly erred in finding that the victim here, Dr. Pai, suffered a substantial hardship. In deferring to the district court's plausible view of the evidence, we conclude that no such error occurred.

The Guidelines provide that if an offense "resulted in substantial financial hardship to one or more victims," a two-level offense increase should apply. U.S.S.G. § 2B1.1(b)(2)(A)(iii). And the Guidelines' commentary also provides a non-exhaustive list of circumstances that can support the enhancement. Of relevance, two examples in the comments clarify that, "[i]n determining whether the offense resulted in substantial financial hardship to a victim, [a district] court shall consider, among other factors, whether the offense resulted in the victim . . . making substantial changes to his or her employment, such as postponing his or her retirement plans" and "suffering substantial harm to his or her ability to obtain credit." U.S.S.G. § 2B1.1(b)(2) cmt. n.4(F)(iv), (vi).

Moreover, a district court's "consideration" of "sworn victim impact statements" to determine whether a victim suffered a "substantial financial hardship" falls within its discretion. *United States v. McClaflin*, 939 F.3d 1113, 1119–20

5

(10th Cir. 2019). And this Court has upheld a district court's determination that a victim suffered a "substantial financial hardship" when such sworn statements "m[et] the standard for substantial financial hardship laid out in the Sentence Guidelines Application Note." *Id.* (citing U.S.S.G. § 2B1.1(b)(2) cmt. n.4(F)(iv), (v)).

This case turns on whether the district court erred in determining that the financial hardship that Dr. Pai suffered was sufficiently substantial. The court concluded that "a preponderance of the evidence" supported that Sutton's conduct caused the doctor to face a "substantial financial hardship" as specified in the Guidelines. R. Vol. II at 50. On appeal, Sutton bears the burden of proving that the record does not support that finding or that the district court "definite[ly]" made a "mistake." *Morales*, 961 F.3d at 1090. In the end, however, he cannot do either. Given that the text of the Guidelines' Application Note clearly includes the harms that Dr. Pai's victim impact statement listed in sufficient detail, the district court did not clearly err in its factual finding, nor did it err in applying U.S.S.G. § 2B1.1(b)(2)(A)(iii).

Out of a non-exhaustive list of what constitutes a "substantial financial hardship," the Guidelines' commentary gives us two relevant examples that apply here. U.S.S.G. § 2B1.1(b)(2) cmt. n.4(F). Because the Guidelines support applying the enhancement if the district court found either of the two grounds, we can also affirm based on either. *See id.* Nevertheless, we address each in turn.

First, the Guidelines advise that a financial hardship is substantial if the defendant's conduct "mak[es] substantial changes to [a victim's] employment, such

as postponing his or her retirement plans." *Id.* § 2B1.1(b)(2) cmt. n.4(F)(iv). The district court found that the record supported that exact harm, and a review of Dr. Pai's statement confirms that reasonable finding.

To begin, it is important to recognize that Dr. Pai is "a small business owner" of a "not-for-profit business." R. Vol. II at 36. Accordingly, he and his business partner always "have placed [them]selves last" and their customers first. *Id.* That is so because instead of earning profits for its owners, the small business uses the money it earns to pursue its "holistic wellness center" objectives—namely, providing its "customers with wellness products such as vitamins and mineral[s] and oils." *Id.* at 11, 36.

Keeping in mind that Dr. Pai is a small, non-profit business owner, the victim impact statement provides an implicit benchmark from which to measure whether the "financial hardship" here is "substantial." U.S.S.G. § 2B1.1(b)(2) cmt. n.4(F). Put differently, these facts and the reasonable inferences from them provide a basis to contextualize Dr. Pai's loss. *See United States v. George*, 949 F.3d 1181, 1185 (9th Cir. 2020) ("The most natural point of comparison is the financial condition of the victim."); *United States v. Castaneda-Pozo*, 877 F.3d 1249, 1252 (11th Cir. 2017) (recognizing that the "same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup" (citation omitted)); *United States v. Minhas*, 850 F.3d 873, 877 (7th Cir. 2017) ("Much of this will turn on a victim's financial circumstances . . . .").

Looking to the victim impact statement, Dr. Pai explained that losing nearly half a million dollars meant that he "was not able to reach [his] financial goals for retirement," which was among the many things he listed as consequently having "been delayed." R. Vol. II at 37. He described his hardship as "a huge financial loss without any way to recoup" it. *Id.* Indeed, he even quantified how much of a hit the half-a-million loss was, stating that the "very extensive" harm amounted to "about 6 years of income for BOTH [him] and [his] partner." *Id.* at 36.

Viewing the evidence as a whole, the district court made a plausible finding that Dr. Pai, an owner of a small, non-profit business, faced a substantial financial hardship that thereby "postpon[ed]" his "retirement plans." U.S.S.G. § 2B1.1(b)(2) cmt. n.4(F)(iv). Thus, we cannot be "left with a definite and firm conviction that a mistake has been made." *Morales*, 961 F.3d at 1090 (citation omitted). And we can affirm based on these findings alone.

Against these findings, Sutton argues that the district court needed more details about the loss of retirement to qualify it as substantial. Specifically, he argues that "the language of Section 2B1.1(b)(2)(A) and the commentary to the guideline make it clear that the enhancement is meant to apply only where the harm caused is especially grave." Aplt. Br. at 12. In doing so, he attempts to poke holes in the district court's findings, identifying what the record does not have instead of admitting to what it *does* have. What Sutton's argument actually comes down to is him asking us to reweigh evidence in the record—affording more weight to what the government did not produce. We cannot.

Our standard of review requires that we "remember[] that we are not free to substitute our judgment for that of the district judge." *McClatchey*, 316 F.3d at 1128 (citation omitted). And here, the record supports the district judge's reasonable inferences that the loss of half a million dollars would delay a small non-profit business owner's retirement—a loss considered as substantial under U.S.S.G. § 2B1.1(b)(2) cmt. n.4(F)(iv). Even though Sutton has an alternative "view[] of the evidence," or rather the lack thereof, our standard of review requires that we hold that "the factfinder's choice between [its view and Sutton's view was not] clearly erroneous." *Anderson*, 470 U.S. at 574.

Even so, Sutton claims that Dr. Pai's victim impact "statement did not supply facts that could support the enhancement because Dr. Pai failed to give any measure of the impact of his losses." Aplt. Br. at 15. For support, Sutton cites sister circuit opinions and an unpublished district court order. Not one helps him, however. Each case he cites recognizes a general principle—namely, that the loss for some (say, a struggling business owner) may be substantial, whereas that same loss for others (say, a Fortune 500 company) may be inconsequential. Relying on the Ninth Circuit's decision in *United States v. George*, Sutton argues that "to satisfy section 2B1.1(b)(2), financial hardship must be substantial in comparison to something else," such as "the financial condition of the victim." 949 F.3d at 1185. That is because "[t]he same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup." *Id.* (quoting *Minhas*, 850 F.3d at 877).

9

Sutton's argument again boils down to him wanting the government to provide more detail of Dr. Pai's financial status, but nothing more. Sutton does not provide any basis for why the loss here was insubstantial. He points to nowhere in the record that indicates that Dr. Pai, despite his small non-profit business owner status, is so financially strong that the half-a-million loss did not phase him. Rather, Sutton only argues that the government did not provide additional evidence to further quantify how the loss hurt Dr. Pai.

Yet, the government did not need to provide more. As even Sutton acknowledges, "[a] court need not necessarily perform an accounting in order to determine the impact of a financial loss, so long as facts or reasonable inferences from those facts provide a basis to contextualize the loss." Aplt. Br. at 14; *see Anderson*, 470 U.S. at 574. "In making its factual findings, a district court may draw conclusions from the testimony and evidence introduced at sentencing." *Minhas*, 850 F.3d at 878. Indeed, only a preponderance of the evidence must support that the loss suffered was substantial to a victim. *See United States v. Kieffer*, 681 F.3d 1143, 1168 (10th Cir. 2012). And for this case, "estimating losses does not require absolute precision, and a district court may make a reasonable estimate based on the available information." *George*, 949 F.3d at 1186 (cleaned up).

In reviewing all the evidence, the district court had a benchmark of Dr. Pai's financial status and had evidence that Dr. Pai's financial hardship was substantial. The victim impact statement's mention of Dr. Pai's small, non-profit business owner status added the context in which to measure his financial hardship, not to mention

the other express statements that quantified how much loss he suffered.  To reiterate, Dr. Pai described himself as "a small business owner" of a "non-profit business" that does not "have back up providers" if he cannot work because of illness or otherwise. R. Vol. II at 36–37.  He said that the total that Sutton illegally redirected—about half a million dollars—amounted to "about 6 years of income for BOTH [him] and [his] partner" and diminished "the ability to fund [their] projects for new health products . . . and services . . . and build out of the remaining part of [their] building with other services that [they] planned to offer to the community." *Id.* at 36.  And in terms of his loss of time, Dr. Pai noted that his company was "still working on" fixing the account problems and damaged customer relationships that Sutton's scheme produced "over two years later." *Id.*

All considered, the district court knew "the financial condition of the victim," and the record supports the court's plausible conclusion that Dr. Pai suffered substantial financial hardship.  *George*, 949 F.3d at 1185.  Sutton does not otherwise point to evidence that leaves this Court "with a definite and firm conviction that a mistake has been made." *Morales*, 961 F.3d at 1090 (citation omitted).  For instance, he does not clearly indicate from the record that Dr. Pai's loss was "only a minor hiccup." *George*, 949 F.3d at 1185 (quoting *Minhas*, 850 F.3d at 877).  As a result, we affirm the district court's substantial financial hardship enhancement.

Even if we were to put aside Dr. Pai's postponed retirement plans, we could affirm on another ground listed in the Guidelines.  A financial hardship can be substantial if a defendant's conduct makes a victim "suffer[] substantial harm to his

11

or her ability to obtain credit." U.S.S.G. § 2B1.1(b)(2) cmt. n.4(F)(vi). Also relying on Dr. Pai's victim impact statement, the district court found that Sutton's fraud scheme "affected significantly and substantially his ability to refinance or get lines of credit despite his good credit score." R. Vol. II at 49–50. The court reasoned that Sutton's scheme made banks consider Dr. Pai to be a high risk borrower, which "significantly and substantially increas[ed] the level of interest rate" he could obtain, "costing him more money long-term." *Id.* at 50.

The victim impact statement supports the district court's finding. Dr. Pai indicated that even though he had an excellent credit score and had never missed a loan payment for his business, Sutton's scheme "made [his] relationship to the banks more difficult." *Id.* at 38. And contrary to what Sutton argues, the impact statement did not just speculate—it provided measurable examples of how Dr. Pai faced "difficult[y]." *Id.* Specifically, Dr. Pai explained that he was not given a favorable refinance opportunity when his loan became due. *Id.* Then, "[w]hen applying for refinancing with other banks," the statement continued to say that the banks "took the issue of the loss as a high risk" and did not want to move forward. *Id.* In addition, Dr. Pai's refinancing cost him "1.5% more" on his loan rate, making the mortgage on his business going forward more expensive over a period of ten years.[1] *Id.*

---

[1] Sutton asserts that this 1.5% figure undercuts the argument that Dr. Pai's ability to obtain credit was substantially harmed. Aplt. Br. at 18. Not so. We find that the 1.5% increase on a loan, in connection with the other harm to Dr. Pai's ability to obtain credit, contributes to the district court's finding that Dr. Pai faced substantial financial hardship. Even if we were to feel differently (and we do not),

In detail, the record supports that Dr. Pai faced difficulty to "obtain credit." U.S.S.G. § 2B1.1(b)(2) cmt. n.4(F)(vi).  And Sutton does not otherwise prove that the record indicates that "a mistake has been made" as to Dr. Pai's hardship in obtaining credit.  *Morales*, 961 F.3d at 1090 (citation omitted).  Therefore, we also affirm the substantial financial hardship enhancement based on the district court's credit findings.

Moreover, aside from the explicit overlap between what the record provides and what the Guidelines' commentary explicitly qualifies as a "substantial financial hardship," the record supports that Dr. Pai suffered substantial financial hardships in other like ways.  To reemphasize, the examples in the Guidelines' commentary are non-exhaustive.  *See* U.S.S.G. § 2B1.1(b)(2) cmt. n.4(F).  As such, Sutton's arguments in no way challenge the district court's findings that Dr. Pai had to restructure his payment platform, experienced delayed payments from his customers, and could not "afford to expand his building or product lines."  R. Vol. II at 50.  In any case, whether it be from Dr. Pai's postponed retirement, his difficulty to obtain credit, or the other financial hardships he faced, we affirm the district court's application of the substantial financial hardship enhancement because we are not "left with a definite and firm conviction that a mistake has been made."  *Morales*, 961 F.3d at 1090 (citation omitted).

---

"we are not free to substitute our judgment for that of the district judge."
*McClatchey*, 316 F.3d at 1128 (citation omitted).

## IV.

Sutton next challenges the district court's decision to impose the "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(10)(C).  Because the record supports that Sutton's scheme involved especially complex conduct in the scheme's execution as well as its concealment, we affirm the imposition of the enhancement.

The "sophisticated means" enhancement applies when "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C).  And the Guidelines' commentary defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  *Id.* § 2B1.1(b)(10) cmt. n.9(B).  The commentary also provides a list of non-exhaustive examples, stating that "sophisticated means" can include "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."  *Id.*  At the same time, this Court has clarified that the methods underlying a fraud scheme do not have to "requir[e] considerable technical acumen."  *United States v. Jones*, 530 F.3d 1292, 1306 (10th Cir. 2008) (finding that the use of fraud "with a home computer . . . added to the scheme's sophistication in that the tactic was designed to avoid detection of fraud").

Moreover, "[t]he Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather . . . the enhancement applies when the

execution or concealment of a scheme, viewed as a whole, is 'especially complex or especially intricate.'" *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010) (quoting U.S.S.G. § 2B1.1(b)(10) cmt. n.9(B)); *see United States v. Snow*, 663 F.3d 1156, 1164 (10th Cir. 2011).  That being so, even a "series of uncomplicated single steps" can warrant a sophisticated-means enhancement if "viewed as a whole," the scheme involves "repetitive and coordinated conduct."  *Weiss*, 630 F.3d at 1279 (citation omitted).  For example, taking "unelaborate steps in a coordinated way to exploit the vulnerabilities of [a] banking system" may suffice.  *Id.* (citation omitted).

Looking at the record below, Sutton's execution and concealment of his scheme involved "especially complex or especially intricate offense conduct." U.S.S.G. § 2B1.1(b)(10) cmt. n.9(B).  The district court found that Sutton exploited his information-technology expertise, as well as his inside knowledge of how the victim conducted his business and payments, "to navigate payment processor accounts, create accounts, transfer money from an unauthorized account to multiple non-authorized accounts in small increments over a long period of time and then return the payment processor to the authorized payment processor to avoid detection."  R. Vol. II at 55; *see, e.g.*, *id*. ("He was in a position to know information otherwise unavailable to others . . . .").

And even after Sutton was fired, he continued to "access[] the victim's computers without authorization and had funds rerouted from the victim's payment processor to another payment processor and eventually into [his] bank account."  *Id.* at 12, 57; *see id.* at 36 ("All the computer accounts, programs, apps, newsletter, point

15

of sale system, online store, etc. ha[d] all been unfortunately accessed by [Sutton] and when he left, it created a disruption since we did not have access to his passwords etc. . . . .").

Even if some of Sutton's methods that perpetuated the scheme could be considered "uncomplicated" or "unelaborate," Sutton took a "series" of "steps" that were especially complex when "viewed as a whole." *Weiss*, 630 F.3d at 1279. Indeed, for nearly seven years, Sutton's scheme involved hundreds of illegal transfers—the very "repetitive and coordinated conduct" that this Court has recognized could form sophisticated means. *Id.* Given the deference that we accord to the district court in making its findings and applying the Guidelines to those findings, the record supports the district court's decision to impose the "sophisticated means" enhancement. U.S.S.G. § 2B1.1(b)(10)(C).

In response, Sutton argues that his conduct was not sophisticated enough. And he asserts that he did not conceal his conduct in a sophisticated manner because each account that illegally diverted funds either had his name or other identifiable information. Regardless of what could have made his scheme more sophisticated, as explained, the record shows that the district court's decision was reasonable given that his online conduct spanned for nearly seven years undetected. Even though Sutton has an alternative "view[] of the evidence," our standard of review requires that we hold that "the factfinder's choice between [its view and Sutton's view was not] clearly erroneous." *Anderson*, 470 U.S. at 574. Therefore, we defer to the district court's application of the Guidelines to the facts and affirm.

16

Sutton also asks us to measure his conduct against defendants from other cases who received the sophisticated means enhancement. He compares the defendant from this Court's decision in *United States v. Snow*, 663 F.3d 1156 (10th Cir. 2011), reasoning that the *Snow* defendant did far more than he did. Sutton then points to an Eleventh Circuit opinion that applied the sophisticated means enhancement to a defendant who hacked computers to obtain passwords. *United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011). But Sutton can only use *Snow* and the Eleventh Circuit case as red herrings. Neither case purports to heighten the bar of what can be considered "sophisticated means." *See generally Weiss*, 630 F.3d at 1279 (concluding that even "a series of uncomplicated single steps" can "suffice for a sophisticated-means enhancement"). The cases may provide sufficient examples, but they do not provide necessary conditions that trigger the enhancement. And as explained, the record supports the district court's finding that Sutton's conduct was sophisticated. Finding no error, we affirm the district court's imposition of the "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(10)(C).

## V.

For these reasons, we AFFIRM.

Entered for the Court

Allison H. Eid
Circuit Judge

17